# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 13-1640

———————————————

Stacy Ann Smith, as trustee for the heirs and next of kin of Eric Kirk Kolski

*Plaintiff - Appellant*

v.

City of Brooklyn Park; Officer Chad Glirbas, individually and in his official capacity; Officer Charles Cudd, individually and in his official capacity

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————————

Submitted: February 12, 2014
Filed: July 3, 2014
[Published]

——————————

Before SMITH, BEAM, and BENTON, Circuit Judges.

——————————

PER CURIAM.

Stacy Ann Smith, as trustee for the heirs and next of kin of Eric Kirk Kolski, filed suit against the City of Brooklyn Park, Minnesota ("the City") and Brooklyn Park Police Officers Chad Glirbas and Charles Cudd (collectively, "defendants"). Smith alleged that the defendants violated Eric Kolski's constitutional rights when the

officers used deadly force against Kolski during a response to a domestic disturbance with a weapon. The defendants moved for summary judgment, and the district court[1] granted the motion. Smith appeals, arguing that the district court erred in granting summary judgment to the defendants because she presented sufficient evidence to create a fact dispute regarding critical facts at the time that the officers used deadly force against Kolski. We affirm.

## I. *Background*

At 6:45 p.m. on November 25, 2008, Pamela Kukowski called 911 to report a domestic disturbance involving a gun at the house that she shared with Kolski. Kukowski explained that she was hiding in the bathroom because Kolski had a shotgun and was threatening to kill her.

Officers responded to the 911 call and set up a perimeter around the house. Officer Glirbas made contact with Kolski at the house's south door and tried to convince Kolski to exit the house. Kolski stood behind the door, blocking Glirbas's vision of Kolski's right side. Officer Cudd, Lieutenant Larry Eckman, Officer Jeremy Halek, and Officer Michael Nordin saw Kolski concealing his right side and right hand.

Officer Glirbas attempted to negotiate with Kolski to get Kolski to exit the house, but Kolski repeated statements like "I'm not going to jail," "I hurt too bad," and that he wanted to speak with "Linda." Officer Glirbas explained to Kolski that he had not gone to jail the last time that the police were at his house and that the police just needed him to step out and talk to them. Kolski replied, "You're going to have to come in here and get me." Kolski then closed the door and went back inside the house.

---

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

As set forth by the district court, the transcript of the 911 call from Kukowski reveals the following:

Kukowski told the dispatcher that Kolski was trying to kick down the bathroom door. (911 Transcript. 8; 911 Audio Track 9.) Dispatch relayed this information to the officers. (911 Transcript. 8; 911 Audio Track 10.)

Kukowski stated that she was afraid that Kolski would shoot through the bathroom door. (911 Transcript 13; 911 Audio Track 21.) Once Kolski realized the police were at the house, he told Kukowski: "If they f* * *ing knock on my door, I'm f* * *ing coming in there, and I'll f* * *ing (inaudible)." (911 Transcript 17; 911 Audio Track 31.) He then yelled, "I will not go to f* * *ing jail. I will not go to f* * *ing jail. Mother f* * *er, you're full of sh* *. (inaudible)." (911 Transcript. 18; 911 Audio Track 34.) The dispatcher told the police that Kolski told Kukowski that "he's not going to jail because of [her]." (911 Transcript 18; 911 Audio Track 37.) Later, Kukowski began screaming, while still on the 911 call, and yelling at Kolski to put the gun away and to get his "arm out of there." (911 Transcript 25–26; 911 Audio Track 47.) Kolski repeatedly asked her if she called the police, and she repeatedly told him to put the gun away. (*Id.*) Kolski then said "You're done." (911 Transcript. 26; 911 Audio Track 47.) Next, Kolski continued to yell, "Let me in this door." (911 Transcript 27; Audio Track 47.)

Dispatch told the police that Kolski still had the gun, that Kukowski repeatedly told Kolski to put the gun away, and that he kept asking her if she called the police. (911 Audio Track 48; 911 Transcript 27.) Kukowski told dispatch that she was afraid that he would shoot through the bathroom door. (911 Transcript 28–30; 911 Audio Track 51.)

Kolski tried to kick the door in and Kukow[sk]i was screaming. (911 Transcript 36–37; 911 Audio, Track 62.) Dispatch told the police that Kolski was trying to kick the door down. (911 Transcript 40; 911 Audio Track 64.) Kukowski told dispatch that Kolski was walking

-3-

around outside the bathroom and the lock on the door no longer worked—she was blocking the door with her legs. (911 Transcript 37–38; 911 Audio, Track 62.) Dispatch told the police that Kukowski could hear him walking around outside the bathroom. (911 Transcript 41; 911 Audio Track 66.)

*Smith v. City of Brooklyn Park*, Civil No. 11–3421 (MJD/JJG), 2013 WL 673861, at *1–2 (D. Minn. Feb. 25, 2013).

Officers interpreted the noises from inside as Kolski attempting to kick in the bathroom door and Kukowski screaming. Based on their determination that Kukowski's life was in danger, the officers decided that immediate entry into the house was necessary. Lieutenant Eckman and Officer Nordin were unsuccessful in their attempt to use tools to enter through the door. The officers then kicked in the door, with Officer Cudd entering first and Officer Glirbas entering behind him.

When Officer Cudd entered the house, he had a barricade in his left hand and his MP5 semi-automatic machine gun in his right hand. Officer Glirbas was also carrying an MP5. Lieutenant Eckman, Sergeant Marcus Erickson, Officer Nordin, Officer Halek, and Officer Rielly Nordan entered next, with their guns drawn. The officers shouted "Police." One of the officers yelled something to the effect of "come out with your hands up" or "show your hands." The transcript of the 911 call reveals that Kukowski told the 911 operator that she heard the officers instruct Kolski to "get down on your hands."

Officer Cudd did not hear a response from Kolski. Because the house was dark and in disorder, the officers had difficulty moving about. The officers entered into the kitchen; when the officers entered, the doorway from the kitchen to the living room was open. Officer Cudd tripped over items as he entered the kitchen adjacent to the living room; as he tripped, Officer Cudd saw a face. Officer Cudd dropped the barricade and turned on the flashlight on his gun to illuminate the living room. He

saw Kolski leaning on the couch with a shotgun raised and pointed at the police officers. Officer Cudd yelled, "He's got a gun!" and fired his weapon at Kolski because he believed that Kolski would kill him or other officers. Officer Glirbas next entered and was a few feet to the left of Officer Cudd when he heard Officer Cudd yell, "He has a gun!" Officer Glirbas also turned on the flashlight on his MP5 semi-automatic machine gun; he saw a male sitting on the couch with a gun in a raised position aimed at the officers. Officer Glirbas believed that Kolski was going to shoot him or Officer Cudd, so Officer Glirbas fired his gun at Kolski. The transcript of the 911 call reveals that Kolski was shot at 7:15 p.m. Officer Glirbas then approached Kolski and moved Kolski's shotgun away from his body.

Officer Halek then handcuffed Kolski behind his back as he lay on the couch. As Officer Halek rolled Kolski over, Kolski fell onto the floor. When Officer Halek checked Kolski's vital signs, Officer Halek found no signs of life. He requested a medical bag and asked dispatch to send the paramedics who were stationed two blocks away. Other officers secured the house and escorted Kukowski out of the bathroom and out of the residence. There was a "partial hole near the center of the [bathroom] door."

Smith alleges that Kolski was in his living room "fully illuminated and unarmed." Neither the transcript of the 911 call nor the officers' statements support this allegation. According to Lieutenant Eckman, when the police entered the home through the kitchen, the kitchen lights were off, but the living room lights were on. Initially, Officer Glirbas blocked Lieutenant Eckman's view, so he could not see whether Kolski was armed. Lieutenant Eckman further stated that he heard officers yell "gun, gun. Drop the gun." Thereafter, he heard gunshots. After the shots were fired, Lieutenant Eckman had a full view of Kolski and could see that he was on the couch and armed with a shotgun next to him with the barrel pointed towards the police.

Kolski died as a result of the gunshot wounds. An autopsy revealed that, at the time of his death, Kolski had a .205 blood alcohol level and multiple painkillers in his system.

Officer Cudd, Officer Glirbas, and other patrol officers were armed with MP5 semi-automatic weapons. The MP5s that patrol officers like Officers Cudd and Glirbas used are equipped to fire only one bullet per trigger pull. Kolski had 16 or 17 bullet wounds. Officer Cudd fired 14 shots and Officer Glirbas fired 13 shots.

On May 21, 2009, a Hennepin County grand jury entered a no bill for Officers Cudd and Glirbas.

Following the shooting, at 8:56 p.m., Hennepin County Sheriff's Office Detective Bogenreif arrived to investigate Kolski's death. Hennepin County Sheriff's Office Detective Steve Sinclair arrived later that evening. They took statements from civilians and photographed the officers and their weapons. They questioned Officer Halek, Officer Nordan, Sergeant Erickson, Officer Nordin, and Lieutenant Eckman the following day. They interviewed Officers Glirbas and Cudd on December 1, 2008.

A 20-gauge shotgun was recovered from Kolski's home, photographed at the scene, and taken to the Hennepin County Crime Laboratory.

On November 22, 2011, Smith filed suit against the City and Officers Glirbas and Cudd, alleging a violation of 42 U.S.C. § 1983 against all the defendants ("Count 1"); violations of 42 U.S.C. § 1983 against the City ("Count 2"); a violation of 42 U.S.C. § 1985 against all the defendants ("Count 3"); assault and battery by Officers Glirbas and Cudd ("Count 4"); negligence by Officers Glirbas and Cudd ("Count 5"); negligence by the City ("Count 6"); and respondeat superior against the City ("Count

7"). The defendants moved for summary judgment on all claims, including on the basis of qualified immunity and official immunity.[2]

The district court granted the defendants' summary judgment motion. Relevant to the present appeal, the district court concluded that Officers Glirbas and Cudd were entitled to qualified immunity on Smith's Fourth Amendment excessive-force claim brought pursuant to § 1983. The court found that an officer's use of deadly force is objectively reasonable where a suspect is pointing a gun at the officer. *Smith*, 2013 WL 673861, at *6 (citing *Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001)). The court cited the following evidence in support of its conclusion that Officers "Cudd and Glirbas reasonably feared for their lives and the lives of the other officers": (1) their knowledge that Kolski "was an armed domestic assault suspect who, they reasonably believed, was going to kill or injure Kukowski, who was trapped in the bathroom by Kolski"; (2) their knowledge that Kolski "was yelling, threatening Kukowski, and trying to break down the door to the bathroom where she was hiding"; (3) their knowledge of Kolski's awareness of the police's presence "because he had talked to officers at his door," "rebuffed police entreaties to come out of the house," and "stated that the police would have to come in and get him"; (4) Kolski's awareness "that police had entered his house because they loudly broke open the door and, as they entered, police officers repeatedly announced 'police'"; (5) the difficulty locating "an armed suspect while entering into a dark room . . . where Kolski sat on the couch with his shotgun"; (6) witnesses' testimony "that Kolski had a weapon aimed at the officers"; (7) Officer Cudd's warning to the other officers "that Kolski had a gun" and his decision to shoot Kolski "because he thought that Kolski was going to shoot him or other officers"; and (8) Officer Glirbas's shooting of Kolski "because he thought Kolski was going to shoot him or Cudd." *Id.*

---

[2]Prior to oral argument on the summary judgment motion, Smith filed a motion to supplement her opposition to the summary judgment motion and submitted a preliminary expert report to the district court. The district court denied this motion, and Smith has not appealed this denial.

The district court rejected Smith's assertion "that Kolski was unarmed, fully illuminated, and had his hands up when he was shot" because of the lack of evidence supporting this claim. *Id.* at *7. According to the court, Lieutenant Eckman's testimony did not support this claim because "Eckman explicitly confirms that Kolski was armed. He also states, consistent with Glirbas and Cudd, that Kolski was on the living room couch and another officer yelled out that Kolski had a gun." *Id.* The court found that "[t]he only discrepancy between Eckman's statement and the statements of other officers is that, while Eckman confirmed that the police entered into a dark house, he also recalled that the lights were on in the living room"; however, the court concluded that "[t]his detail does not change the analysis of the reasonableness of the officers' actions." *Id.*

The court also found that no physical evidence "establish[ed] a genuine issue of material fact as to whether Kolski was armed." *Id.* And, it noted that no other evidence in the record established "that Kolski was unarmed when he was killed." *Id.* Instead, Officers "Glirbas and Cudd both advised that, after entering Kolski's home, they saw Kolski sitting on a couch in the living room, pointing a shotgun in Cudd's direction. An officer is permitted to use deadly force when he is confronted with a suspect pointing a gun at him." *Id.* The court determined that Smith could not "create a fact dispute simply by attacking the officers' credibility." *Id.* (citing *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)).

The court also pointed out that "[t]he information known to Defendants when they entered the home was based on undisputed radio traffic that repeatedly reported that Kolski was armed and threatening to kill Kukowski." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). According to the court, Smith

> has the audio and transcript of Kukowski's 911 call throughout the incident, the radio traffic for the officers, the autopsy report, crime scene photos, an extensive witness statement from Kukowski, and police

-8-

statements. As in *Janis* [*v. Biesheuvel*, 428 F.3d 795 (8th Cir. 2005)], the alleged victim, Kolski, is deceased and there are no other witness to the incident besides the officers and Kukowski. There is no basis for Plaintiff to allege that Kolski was unarmed when every witness testified that he was armed or that they could not see him; the 911 call, radio traffic, and Kukowski's interview clearly indicate that he was armed and threatening violence; and the crime scene photographs document his firearm near where he was killed.

*Id*. at *8. Based on the undisputed evidence, the court concluded that, viewing the facts in the light most favorable to Smith, Officers Glirbas and Cudd "had probable cause to believe that Kolski posed a threat of serious physical harm to the officer or others"; therefore, the court granted summary judgment to the officers on the basis of qualified immunity. *Id.*

Relatedly, the court found that "[o]fficial immunity bars the state law claims of assault and battery and negligence against Cudd and Glirbas in Counts Four and Five and of respondeat superior liability against the City in Count Seven." *Id*. at *9. This was because the officers "were discretionary actors when they used deadly force against Kolski. As the Court discussed with regard to the issue of qualified immunity, there is no evidence that Cudd or Glirbas acted willfully and maliciously. They acted reasonably in response to a significant threat of death or physical injury." *Id*. at 10.

The court also dismissed Smith's *Monell* claim against the City brought pursuant to § 1983 and the § 1985 conspiracy claim.[3]

## II. *Discussion*

Smith argues that the district court erroneously granted summary judgment to the officers on the basis of qualified and official immunity on her Fourth Amendment

---

[3]Smith does not challenge the district court's dismissal of these claims.

excessive-force claim and state-law claims. Smith contends that she presented sufficient persuasive evidence to show the existence of a material fact dispute regarding critical facts at the time that the officers used deadly force. According to Smith, the district court erroneously relied on the self-serving statements of the officers who shot Kolski and ignored physical and circumstantial evidence that, if credited, would discredit the officers' version of events and support a jury finding that Kolski was unarmed and had his hands up at the time that he was shot. She claims that statements in the record contradict the officers' claim that the living room where Kolski was shot was dark and that, prior to shooting Kolski, officers yelled, "Gun, he has a gun." She contends that the physical evidence strongly suggests that, contrary to the officers' claim, Kolski was not shouldering a gun when he was shot but was instead unarmed and with his hands up. Smith points to Lieutenant Eckman's statement that the lights were on in the living room, which is contrary to the claim of Officers Cudd and Glirbas that the home was dark. She also notes that while all the officers claim to have heard an officer yelling "gun," Kukowski heard the officers command Kolski to "get down on your hands" immediately before shots were fired, which, she contends, is an unusual statement for officers to yell at a man pointing a gun at them prior to opening fire. She also finds inconsistencies in the officers' testimony as to the position of Kolski's body after the shooting. Finally, Smith argues that the number and location of Kolski's gunshot wounds support an inference that he was lying down or in a semi-supine position when shot.

A. *Qualified Immunity*

We review de novo a district court's determination of whether a government official is entitled to qualified immunity. *Burton v. Ark. Sec. of State*, 737 F.3d 1219, 1228 (8th Cir. 2013). "A government official is entitled to qualified immunity from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Id*. (quotation and citation omitted). When reviewing the district court's grant of summary judgment on the basis of qualified immunity, we must view the facts in the

-10-

light most favorable to the non-moving party. *Id.* When determining whether a government official is entitled to qualified immunity, we apply a two-step inquiry: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id*. (quotation and citation omitted). The Supreme Court has allowed us "'to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id*. at 1228–29 (alteration in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

> "All claims that law enforcement officers have used excessive force, whether deadly or not, in the course of an arrest, investigatory stop, or other seizure are analyzed under the Fourth Amendment's objective reasonableness standard." *Nance v. Sammis*, 586 F.3d 604, 609–10 (8th Cir. 2009). "Not every push or shove violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them." *Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009) (quotations, alteration, and citation omitted). "The key question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Nance*, 586 F.3d at 610 (quotations and citation omitted). "Objective reasonableness depends on the facts and circumstances of the case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Rohrbough*, 586 F.3d at 586 (quotations and citations omitted).

*Royster v. Nichols*, 698 F.3d 681, 691 (8th Cir. 2012).

We have recognized that "no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently

-11-

loaded weapon." *Sinclair v. City of Des Moines, Iowa*, 268 F.3d 594, 596 (8th Cir. 2001) (per curiam). "As the Supreme Court has explicitly said, use of deadly force is permissible when the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). "'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). "[T]o defeat the motion for summary judgment, [Smith] needed to present enough evidence to permit a reasonable jury to conclude that [the officers'] use of deadly force was objectively unreasonable." *Thompson*, 257 F.3d at 899.

In *Thompson*, an officer chased a suspect who ran between two buildings and climbed over a fence. *Id.* at 898. According to the officer, the suspect "got up from the ground, looked over his shoulder at [the officer], and moved his arms as though reaching for a weapon at waist level." *Id.* The suspect had turned his back toward the officer and "obscured his hands from [the officer's] view." *Id.* The officer yelled for the suspect to "stop," but the suspect's "arms continued to move"; the officer "fired a single shot into [the suspect's] back just below his right shoulder blade." *Id.* The suspect died from the gunshot, and no weapon was recovered from his body. *Id.* Another officer, "who had followed most of the foot chase in a patrol car, stated that he attempted to look down the space between the two buildings where he had seen [the suspect] and [the officer] run, but that he neither saw nor heard the shooting, leaving [the officer] as the lone surviving witness to the shooting." *Id.* The deceased suspect's family members filed suit under § 1983 alleging excessive force in violation of the deceased's constitutional rights. *Id.* The district court granted summary judgment to the officer, the officer's supervisor, and the city. *Id.*

On appeal, we "conclude[d] that summary judgment was appropriate" where the officer's "use of force, as he describe[d] it, was within the bounds of the Fourth Amendment, and all of the evidence presented to the district court [was] consistent with that account." *Id*. (citing *Krueger v. Fuhr*, 991 F.2d 435, 439 (8th Cir. 1993) (summary judgment against plaintiffs appropriate despite the fact that the suspect was shot in the back where such a shot was consistent with the reasonable use of force described by the officer); *Gardner v. Buerger*, 82 F.3d 248, 253 (8th Cir. 1996) (summary judgment inappropriate where officer's own account of shooting raised genuine issue as to its reasonableness)). We explained that "[t]he plaintiffs may not stave off summary judgment 'armed with only the hope that the jury might disbelieve witnesses' testimony.'" *Id*. (quoting *Gardner*, 82 F.3d at 252). We found that "neither the plaintiffs' attacks on [witnessing officer's] credibility nor anything else in the record undermine[d] [the officer's] credibility." *Id*. at 899–900. The plaintiffs' evidence was "simply insufficient to support even an inference that [the officer] [was] lying" and failed "to satisfy the plaintiffs' burden of proving that his actions were not objectively reasonable." *Id*. at 900.

Here, Smith identifies purported "inconsistencies" in the officers' statements in support of her argument that genuine issues of material fact exist as to whether the officers' use of force was excessive. She contends that these "inconsistencies" show that, taking the facts in the light most favorable to her, Kolski was unarmed with his hands up at the time that the officers shot him. But, as in *Thompson*, we conclude that Officers Cudd and Glirbas describe a scene in which the use of deadly force was constitutionally permissible. Their account is strengthened by statements from other officers and the transcript of the 911 call. No genuine issues of material fact exist as to whether Kolski made threats and possessed a firearm. As the district court correctly found, "[t]here is no evidence in the record that Kolski was *unarmed* when he was killed." *Smith*, 2013 WL 673861, at *7 (emphasis added).

-13-

First, Smith attacks the credibility of Officers Cudd and Glirbas, arguing that their claim that the entire home was dark is contradicted by Lieutenant Eckman's statement that the lights were on in the living room. The district court adequately explained why this purported "inconsistency" is insufficient to create a genuine issue of material fact as to whether "Kolski was unarmed, fully illuminated, and had his hands up when he was shot." *Id*. According to the court:

> Eckman's statements do not support Plaintiff's argument. Eckman testified that, when he initially encountered Kolski, Kolski was on the living room couch, but, because Glirbas and Cudd were ahead of Eckman and Glirbas was blocking Eckman's view, Eckman could "only see his body from his knees down" and could not see if he was armed. (Eckman Statement at 6.) However, he further testified that Glirbas and Cudd were yelling "gun, gun. Drop the gun." (*Id*.) Then, after they shot Kolski, Eckman moved so he had a full view of Kolski on the couch and he could see that Kolski was armed with a shotgun that "was next to him with the barrel pointed in our direction." (*Id*. at 6–7.) *Eckman explicitly confirms that Kolski was armed*. He also states, consistent with Glirbas and Cudd, that Kolski was on the living room couch and another officer yelled out that Kolski had a gun. The only discrepancy between Eckman's statement and the statements of other officers is that, while Eckman confirmed that the police entered into a dark house, he also recalled that the lights were on in the living room. *This detail does not change the analysis of the reasonableness of the officers' actions*.

*Id*. (emphases added).

Second, Smith contends that all of the officers' testimonies that they heard another officer yelling "gun" is inconsistent with Kukowski hearing the officers instruct Kolski to "get down on your hands" immediately before shots were fired. Smith asserts that telling a suspect to "get down on your hands" "is an unusual statement for officers to yell at a man pointing a gun at them, and prior to opening fire"; therefore, she concludes that a factfinder could draw a "reasonable inference

that . . . Kolski was not armed or pointing a gun at officers, but rather sitting or standing unarmed when shot." Smith's contention that Kukowski was unarmed based on an officer telling him to "get down on your hands" is at best speculative and contradicts all of the objective evidence in the record, including the transcript of the 911 call, which described Kolski as armed. As the district court explained, "The information known to Defendants when they entered the home was based on undisputed radio traffic that repeatedly reported that Kolski was armed and threatening to kill Kukowski." *Id*. (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")).

Third, Smith argues that all of the officers' statements as to the positioning of Kolski's body after the shooting are inconsistent with one another and lead to the inference that Kolski was unarmed. Again, all of the officers' statements and the objective evidence of the 911 call show that Kolski was, in fact, armed. Smith's mere speculation that Kolski was *not* armed is contradicted by the record. *Cf. Scott*, 550 U.S. at 380.

Finally, Smith points to multiple gunshot wounds to Kolski's head, shoulders, and arms as creating a reasonable inference that Kolski was unarmed. While 16 or 17 bullet wounds seems like a large number for two officers facing one suspect, it still does not negate the objective evidence that Kolski was armed during the encounter.

Therefore, we affirm the district court's grant of summary judgment on the basis of qualified immunity to Officers Glirbas and Cudd.

B. *Official Immunity*

Minnesota law provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Elwood v. Rice Cnty.*, 423 N.W.2d 671, 677 (Minn. 1988) (quotation and citations omitted).

> Determination of whether official immunity is available in a given context requires a two-step inquiry: (1) whether the alleged acts are discretionary or ministerial; and (2) whether the alleged acts, even though of the type covered by official immunity, were malicious or willful and therefore stripped of the immunity's protection.

*Dokman v. Cnty. of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001) (citation omitted).

"Under Minnesota law, the decision to use deadly force is a discretionary decision entitling a police officer to official immunity absent a willful or malicious wrong." *Hayek v. City of St. Paul*, 488 F.3d 1049, 1056 (8th Cir. 2007) (citing *Maras v. City of Brainerd*, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993)). Therefore, under step one of the official-immunity inquiry, Officers Glirbas and Cudd were discretionary actors when they used deadly force against Kolski.

Under step two of the official-immunity inquiry, the Minnesota Supreme Court has

> stated that in determining whether an official has committed a malicious wrong, the fact finder considers whether the official has intentionally committed an act that he or she had reason to believe is prohibited. *Rico v. State*, 472 N.W.2d 100, 107–08 (Minn. 1991). The *Rico* standard contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions.

-16-

*State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).

Here, Smith has identified no evidence showing that Officers Cudd or Glirbas intentionally committed an act that they had reason to believe was prohibited; instead, we agree with the district court that the record evidence shows that "[t]hey acted reasonably in response to a significant threat of death or physical injury." *Smith*, 2013 WL 673861, at *10.

We affirm the district court's grant of summary judgment to Officers Glirbas and Cudd on Smith's state-law claims on the basis of official immunity.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____