# United States Court of Appeals

### For the Eighth Circuit

_____

## No. 22-3193

_____

Jennifer Morgan-Tyra

*Plaintiff - Appellant*

Michael Morgan

*Plaintiff*

v.

City of St. Louis

*Defendant*

Andrei Nikolov

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 21, 2023
Filed: January 8, 2024

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

While responding to a domestic-disturbance call, Officer Andrei Nikolov shot a woman who was holding a gun and shouting expletives at someone concealed from his view. The woman brought an excessive-force claim, but the district court[1] dismissed it at summary judgment. In the absence of a clear legal answer to whether an officer can use deadly force in this situation, we affirm.

I.

Officer Nikolov and his partner responded to a St. Louis home after a 911 call. The dispatcher informed them that "Karla Nicholson [was] having a dispute with her . . . roommate [who] possibly ha[d] a gun and ha[d] threatened her. She [wa]s locked in her bedroom."

The parties dispute much of what happened from there, but a few points of agreement exist. The first is that there was a second 911 call at some point: a person named "Jennifer Tyra" had called from the same location and reported that a "white female armed with a screwdriver [was] trying to attack [her]. Jennifer [wa]s armed with a gun [and had] threatened to shoot her if the female came close to her." The parties disagree, however, about whether Officer Nikolov heard about the second 911 call.

Everyone generally agrees about what happened next. After pounding on a closed metal screen door, the officers encountered a man inside who said something along the lines of, "I tried to calm the situation down[;] they are in the back." As they moved toward the standoff, Officer Nikolov first heard "screaming" and "swear words" and then saw Jennifer Morgan-Tyra standing in a hallway with a gun in her hands. The person on the other end of it—later identified as Nicholson—was in a

_____

[1]The Honorable Matthew T. Schelp, United States District Judge for the Eastern District of Missouri.

bedroom around the corner, out of Officer Nikolov's view. Someone directed Morgan-Tyra to drop the gun, but instead of complying, she continued to shout expletives at the person in the bedroom. According to her own deposition, her "intention" was "to use [her] words to intimidate" and make the other person "believe [she] would shoot." Where exactly she was pointing the gun, however, is disputed.

What is clear is that Officer Nikolov ended the standoff by firing at least nine shots, several of which struck Morgan-Tyra and caused severe and lasting injuries. She sued him, claiming he had used excessive force. *See* 42 U.S.C. § 1983. After initially denying summary judgment and allowing additional discovery, the district court changed its mind and granted qualified immunity.[2] Morgan-Tyra's position is that her excessive-force claim should have gone to a jury.

## II.

We review the district court's summary-judgment ruling de novo, viewing the record in the light most favorable to Morgan-Tyra and drawing all reasonable inferences in her favor. *See N.S. ex rel. Lee v. Kan. City Bd. of Police Comm'rs*, 35 F.4th 1111, 1113 (8th Cir. 2022). In a case like this one, where the "opposing parties tell two different stories," *Scott v. Harris*, 550 U.S. 372, 380 (2007), we "evaluate the evidence using the plaintiff-friendly version of the facts," *N.S.*, 35 F.4th at 1113. If those facts entitle the officer to judgment as a matter of law, we will affirm the grant of summary judgment. *See id.*

In a case involving a qualified-immunity defense, summary judgment is appropriate if: (1) the plaintiff-friendly version of the facts fails to establish a constitutional violation; or (2) the law at the time did not clearly establish the right.

---

[2]Morgan-Tyra believes that the district court's decision to grant summary judgment after first denying it violates the law-of-the-case doctrine. Not so. The doctrine only "applies to decisions made on *appeal*," not to situations in which a *district court* changes its mind while a case is pending. *Mosley v. City of Northwoods*, 415 F.3d 908, 911 (8th Cir. 2005) (emphasis added).

-3-

*See Dean v. Bearden*, 79 F.4th 986, 988 (8th Cir. 2023). We may rely on either basis to affirm, and here our focus is the latter. *See Camreta v. Greene*, 563 U.S. 692, 706–07 (2011).

The allegation is that Officer Nikolov used excessive force when he shot Morgan-Tyra multiple times. We apply an objective-reasonableness standard to the amount of force used, accounting for "the fact that police officers are forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). An unreasonable act in one situation may be reasonable in another. *See id.* at 396. And just as excessive-force claims must be "judged from the perspective of a reasonable officer on the scene," *id.*, qualified immunity depends on the "factual situation the officer confronts," *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation omitted). In this way, the law gives officers a double benefit of the doubt: "in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

As fact-intensive as excessive-force cases usually are, the Supreme Court has provided a straightforward rule in situations like this one: officers may use deadly force when there is "probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer *or to others*." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (emphasis added). The only qualifier is that "an officer should give 'some warning' when it is 'feasible' to do so." *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012) (quoting *Garner*, 471 U.S. at 11–12). Both common sense and our cases suggest that a warning is less likely to be "feasible" in a high-pressure situation that requires a split-second judgment. *See, e.g.*, *McElree v. City of Cedar Rapids*, 983 F.3d 1009, 1018 (8th Cir. 2020).

This situation was about as high pressure as it gets. The woman right in front of Officer Nikolov was holding a gun while shouting expletives at someone he could not see. He knew she had been the subject of at least one 911 call, if not two, and

-4-

was obviously angry at the person on the other end of the gun. Not to mention that he had already encountered someone who had tried—without success—to deescalate the situation. Even if we assume that Officer Nikolov's split-second decision to shoot without warning[3] was objectively unreasonable under the circumstances, he still did not violate a *clearly established* right. *See Kisela*, 138 S. Ct. at 1153 (explaining that qualified immunity applies unless "any competent officer would have known that shooting [someone] to protect [another] would violate the Fourth Amendment").

Morgan-Tyra counters with the fact that she was only defending herself, a legal right she had under Missouri law. *See* Mo. Rev. Stat. § 563.031.1. The problem is that a reasonable officer would not have known who was standing in front of him: the "initial aggressor" or a victim who had fought back. *Id.* It is true that the second message from dispatch said that a woman named "Jennifer Tyra" had armed herself in response to an attack by her roommate. But it is too much to expect a reasonable officer to sort out everyone's identity in the heat of the moment, when the person right in front of him appears to be on the verge of shooting someone. The point is that, even if Officer Nikolov misjudged the threat, we cannot say that he acted in a *clearly* unreasonable way. At most, his actions fall within the "hazy border between excessive and acceptable force," which gives him the benefit of qualified immunity. *Mullenix v. Luna*, 577 U.S. 7, 18 (2015) (per curiam) (citation omitted).

---

[3]The evidence is somewhat equivocal on this point. Officer Nikolov claims he gave a warning, and others who were there agreed. Even Morgan-Tyra admitted as much at first, but later claimed otherwise. From our review of the 911 calls, *someone* gave a warning. But given the fact dispute, we will assume it was not Officer Nikolov, even if there is reason to doubt Morgan-Tyra's inconsistent accounts. *See N.S.*, 35 F.4th at 1113; *Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 391 (8th Cir. 2010) ("A party cannot offer testimony that contradicts the party's earlier statements made under oath to create a genuine issue of material fact.").

Indeed, other cases suggest that deadly force is available in these circumstances. Consider *Smith v. City of Brooklyn Park*, 757 F.3d 765 (8th Cir. 2014) (per curiam), which also involved a domestic-disturbance call. A woman had reported that her male roommate "had a shotgun and was threatening to kill her." *Id.* at 767. At first, the officers tried to get the man to leave on his own. Then, when they heard noises coming from inside suggesting the woman's life could be in danger, they kicked in the door and entered the house. *Id.* at 768.

The house was dark, so they shouted commands like "come out with your hands up" with the hope that the man would surrender. *Id.* Then, after rounding a corner, one officer tripped and "saw a face." *Id.* He turned on his flashlight and saw the man "leaning on the couch with a shotgun raised and pointed" in the officers' direction. One officer fired after shouting, "[h]e's got a gun!" *Id.* Another rushed in and began shooting too. *Id.* Of the 27 shots fired, 16 or 17 hit the man, who eventually died. *Id.* at 769.

We concluded that the officers had "describe[d] a scene in which the use of deadly force was constitutionally permissible." *Id.* at 773. The man had "made threats and possessed a firearm," so the officers' conduct was objectively reasonable under the circumstances. *Id.* Given that the facts in this case also involve an individual who "made threats and possessed a firearm," *id.*, there is not much room for Morgan-Tyra to argue that she had a *clearly* established right to be free from deadly force.

No one identifies a case as close as *Smith*, and the dissent hardly tries. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (requiring "existing precedent [to] have placed the . . . constitutional question beyond debate"). Morgan-Tyra, for her part, relies on *Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005), but the officer in that case encountered *two* men wrestling over a gun, *see id.* at 959. By the time the officer fired a shotgun, one of them had already captured the gun and was pointing it "overhead." *Id.* at 961. We concluded that using a shotgun "without warning" was objectively unreasonable under the circumstances because a "trained" officer

would have known that "the shot would hit both men." *Id.* Here, by contrast, there was no shotgun, no struggle over a gun, and no suspect pointing a gun overhead. For those reasons, "a reasonable officer could miss the connection between that case and this one." *City of Tahlequah v. Bond*, 595 U.S. 9, 14 (2021) (per curiam).

The same goes for *Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127 (8th Cir. 2020). For one thing, we decided it based on the law in effect *after* the events in this case occurred, meaning it could not have clearly established a right *beforehand*. *See al-Kidd*, 563 U.S. at 735 (specifying that courts must assess the law as of "the time of the challenged conduct"). For another, the threat of harm in *Cole* had "passed": the potential victim had "entered his home and slammed the front door," putting a physical barrier in the way of the aggressor, who was outside. *Cole*, 959 F.3d at 1131–32. And then, only after the aggressor "turned away," did the officer begin shooting at him. *Id.* at 1131. Under those circumstances, we concluded that the use of deadly force was "objectively unreasonable." *Id.* at 1134.

The potential threat here, by contrast, had not "passed." *Id.* at 1132. Officer Nikolov reasonably believed that Morgan-Tyra had a gun pointed in the general direction of someone in another room. And, as she admits, she used expletives to make others "believe [she] would shoot." Although she makes much of the fact that she was pointing the gun in a downward direction,[4] it makes no difference because,

---

[4]Morgan-Tyra's story has shifted on this point too. She agreed in her first deposition that the gun "was still pointed directly" at Nicholson "in the seconds leading up to" the shots. She then initially stated in her second deposition that the gun was down and "aim[ed] . . . at the floor." But she soon corrected herself and returned to what she said before: "at the moment [she was] shot, [she was] still pointing the gun directly at . . . Nicholson." We will give her the benefit of the doubt and resolve the factual dispute created by her *own* testimony in her favor, even though we are not required to do so, because qualified immunity applies either way. *See N.S.*, 35 F.4th at 1113; *Stewart v. Rise, Inc.*, 791 F.3d 849, 861 (8th Cir. 2015) ("We may discount a plaintiff's self-serving . . . deposition testimony as a matter of law where it clearly contradicts the plaintiff's earlier testimony under oath and where the plaintiff offers no explanation for the inconsistencies.").

even crediting her version of facts, she was wielding it in a "menacing fashion" and "appear[ed] ready to shoot." *Id.* at 1134–35 (citation omitted); *cf. Partridge v. City of Benton*, 929 F.3d 562, 566 (8th Cir. 2019). Officer Nikolov, having just entered this "tense, uncertain, and rapidly evolving" situation, *N.S.*, 35 F.4th at 1114 (quoting *Graham*, 490 U.S. at 397), "had no way of knowing what [Morgan-Tyra] planned to do," *Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014).

### III.

We accordingly affirm the judgment of the district court.

KELLY, Circuit Judge, dissenting.

On de novo review of the district court's grant of summary judgment, we must view the record in the light most favorable to the nonmovant—Morgan-Tyra—and we must draw all reasonable inferences in her favor. Jackson v. Stair, 944 F.3d 704, 709 (8th Cir. 2019). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). Applying these standards, a genuine dispute of material fact remains as to where Morgan-Tyra's gun was pointing when Officer Nikolov shot her. This means Officer Nikolov is not entitled to summary judgment.

As the court acknowledges, where Morgan-Tyra was pointing her gun when Officer Nikolov shot her is disputed. When she was deposed in the hospital, Morgan-Tyra initially could not remember where she was pointing her gun when she was shot. She later explained that before she was shot, she was standing in the hallway at the threshold of the bedroom Nicholson was in. Morgan-Tyra said she would "aim" her gun "at the floor" when Nicholson sat down on the bed in the room, and she would point it at Nicholson when Nicholson stood up. But Morgan-Tyra specified that when she heard the gunshots and fell to the ground, Nicholson was sitting down. Thus, according to Morgan-Tyra, when Officer Nikolov shot her, her gun was "down." Officer Nikolov describes the situation differently. He said that

Morgan-Tyra had been pointing her gun at an angle in front of her but then Morgan-Tyra "lowered it from" Nicholson, "and as she turned towards [Officer Nikolov], she raised it" "directly at" *him* and he started shooting. There is enough evidence for a jury to find in favor of either side. Accordingly, this dispute is genuine. See Partridge v. City of Benton (Partridge II), 70 F.4th 489, 491 (8th Cir. 2023) (citing Zubrod v. Hoch, 907 F.3d 568, 575 (8th Cir. 2018)).

This dispute is also "material because it is 'outcome determinative under prevailing law.'" Partridge II, 70 F.4th at 492 (quoting Holloway v. Pigman, 884 F.2d 365, 366 (8th Cir. 1989)). In assessing whether a use of force was reasonable, we consider, *inter alia*, whether the individual "pose[d] an immediate threat to the safety of the officer or others." Partridge v. City of Benton (Partridge I), 929 F.3d 562, 565 (8th Cir. 2019) (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam)). "[A]n individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat." Cole ex rel. Est. of Richards v. Hutchins, 959 F.3d 1127, 1132 (8th Cir. 2020) (citations omitted). More is needed: "the suspect must also point the firearm at another individual or take similar 'menacing action.'" Id. (citing Partridge I, 929 F.3d at 566). This is still not the end of the inquiry: if the individual *did* pose a threat, *when* they posed it matters because "mere seconds after an immediate threat has passed is sufficient time for an officer to conclude the immediate threat has passed, extinguishing any prior justification for the use of deadly force." Cole, 959 F.3d at 1135 (citing Ludwig v. Anderson, 54 F.3d 465, 474 (8th Cir. 1995)); see also Nance v. Sammis, 586 F.3d 604, 611–12 (8th Cir. 2009) ("[An officer's] failure to take action to deescalate the situation if he had an opportunity and means to do so could establish liability.").

In this case, where Morgan-Tyra's gun was pointed at the moment when Officer Nikolov shot her is determinative of whether Morgan-Tyra posed a threat that justified the use of lethal force. Put differently, "the dispositive fact in this case is whether [Morgan-Tyra] pointed [her] gun at the officers [or at Nicholson,] or otherwise moved it in a menacing way" when Officer Nikolov shot her. See Partridge

II, 70 F.4th at 494 (Shepherd, J., dissenting). If she did, Officer Nikolov may have been justified in his use of lethal force. But if Morgan-Tyra did not point her gun at another person—here, Officer Nikolov or Nicholson—or otherwise move her gun in a menacing way, his use of force was not justified. See id. at 493 (majority opinion); Cole, 959 F.3d at 1135 (recognizing clearly established principle that a person is not an immediate threat unless they appear "ready to shoot" (quoting Nance, 586 F.3d at 611)); see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 8–9 (2022) (holding that the Second Amendment protects an individual's right to carry a handgun for self-defense outside the home); cf. Walters v. Wolf, 660 F.3d 307, 318 (8th Cir. 2011) (declining to "foreclose the possibility that [a] plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a . . . firearm that he or she otherwise lawfully possessed for self-defense").

This issue remains in dispute. The court says otherwise, concluding that "Officer Nikolov reasonably believed that Morgan-Tyra had a gun pointed in the general direction of someone in another room." Putting aside the fact that Officer Nikolov testified that he believed her gun was pointed elsewhere when he shot her,[5]

---

[5]At his deposition, Officer Nikolov said that Morgan-Tyra "lowered [the gun] from Ms. Nicholson," turned toward him, and "raised it." In his sworn affidavit, he was even more specific:

> I again loudly ordered Morgan-Tyra to drop the gun and she did not drop the gun. Instead, Morgan-Tyra began to lower the gun while she turned in my direction, making eye contact with me. Morgan-Tyra quickly began to raise the gun back up, directly at me, at which time I fired my Department issued handgun at Morgan-Tyra until the threat she posed had ceased.

As a result of these assertions, Morgan-Tyra was charged with assault of a law enforcement officer and armed criminal action, where Officer Nikolov was the victim. When asked to testify in the criminal case against Morgan-Tyra, Officer Nikolov asserted his Fifth Amendment rights and declined to answer any questions, and the St. Louis Attorney's Office eventually dropped the charges.

the court's conclusion fails to view the evidence in the light most favorable to Morgan-Tyra. Morgan-Tyra had more than one version of events, but in the one most favorable to her,[6] she testified that she was aiming her gun "down" at the moment she was shot, not that she was pointing it in the direction of anyone. To the extent the court relies on evidence that Morgan-Tyra was pointing the gun in the direction of Nicholson in the moments leading up to the shooting, that is not the relevant moment in time for her excessive force claim. See Cole, 959 F.3d at 1135 (collecting cases supporting the proposition that "[deadly] force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased" (quoting Lytle v. Bexar Cty., 560 F.3d 404, 413 (5th Cir. 2009))); Jackson, 944 F.3d at 711–12; Nance, 586 F.3d at 610 (observing that we look at whether the individual "poses an *immediate* threat to the safety of the officers or others" in evaluating reasonableness of use of force (quoting Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009)) (emphasis added)).

The court also asserts that even if Morgan-Tyra was pointing the gun at the floor—and we have to assume she was—Officer Nikolov did not use excessive force when he shot her because Morgan-Tyra was "wielding" the gun in a "menacing fashion." The plaintiff-friendly version of the facts is that when Officer Nikolov shot Morgan-Tyra, her gun was pointed at the floor, and not at a person. She may have hoped Nicholson would think she would use the gun. But what a plaintiff may have subjectively intended "is not determinative . . . of what a reasonable officer on the scene would have perceived. Nor does it answer whether 'the officer['s] actions [were] "objectively reasonable" in light of the facts and circumstances confronting [him].'" Partlow v. Stadler, 774 F.3d 497, 502 (8th Cir. 2014) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)); see also Hernandez v. Jarman, 340 F.3d 617, 624 (8th Cir. 2003) ("The reasonableness of [an officer]'s use of deadly force is judged from the perspective of a reasonable officer on the scene, and not from the unknowable intentions of the victim.") (citation omitted). What is relevant are her

_____

[6]Morgan-Tyra was hospitalized at the VA Medical Center when her first deposition was taken, and during that deposition she was in her hospital bed receiving treatment for complications from the shooting.

actions. When she was shot, Morgan-Tyra was not pointing her gun at Officer Nikolov or at Nicholson. And to describe her as "wielding" the gun in a "menacing fashion" is to make inferences in favor of Officer Nikolov, which we cannot do. See Cole, 959 F.3d at 1132; Partridge I, 929 F.3d at 566. Because "the evidence does not indisputably establish where and how [or even if, Morgan-Tyra] moved the gun as [s]he was shot, this court should not conclude—without a trial—that [she] took a 'menacing action' with the firearm that created an immediate deadly threat." Partridge II, 70 F.4th at 492 n.2.

At summary judgment we are required to view the controverted record in the light most favorable to Morgan-Tyra, the nonmoving party. Nance, 586 F.3d at 610. When the facts are viewed in that light, Morgan-Tyra has identified a genuine dispute of material fact about where she was pointing her gun when Officer Nikolov shot her multiple times in the back, permanently paralyzing her. This precludes summary judgment.[7] See Partridge II, 70 F.4th at 493.

I respectfully dissent.

_____

---

[7]Viewing the facts in the light most favorable to Morgan-Tyra, and adopting that version of events, it is clearly established that Officer Nikolov's use of force was excessive. See Cole, 959 F.3d at 1134–35; Partridge II, 70 F.4th at 492–93.