# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3579
_____

Bernadine Stewart

*Plaintiff - Appellant*

v.

Rise, Inc.

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis
_____

Submitted: November 12, 2014
Filed: June 30, 2015
_____

Before MURPHY, MELLOY, and BENTON, Circuit Judges.
_____

MELLOY, Circuit Judge.

Bernadine Stewart sued her employer, Rise, Inc., alleging a hostile work environment and discriminatory termination based on a combination of race, sex, and national-origin discrimination. She also alleged retaliatory termination under federal and state law. Stewart, an American-born African-American woman, alleges specifically that a group of her subordinates, consisting largely of male, Somali-born immigrants, created the hostile work environment. She also alleges her own

supervisors ignored her complaints for assistance, denied her the authority to terminate the offending employees, allowed the hostile environment to persist, and eventually terminated her employment as an act of discrimination and retaliation. The district court granted summary judgment for Rise. We reverse and remand as to the hostile work environment claim but affirm in all other respects.

In doing so, we note the unusual nature of this case involving allegations of prohibited-animus hostility from subordinates towards an immediate supervisor with that hostility possibly tolerated by higher-level supervisors. There is no dispute that the workplace at issue involved people engaging in outrageous behavior. Rather, the dispute exists as to what Stewart reported up the chain of command and whether the reported conduct rose to the level of actionable hostility.

I. Background

A. General Background

From January 2007 through March 2012, Stewart served as supervisor of a branch office for Rise, a welfare-services non-profit entity in the Twin Cities. Rise helped people enter the workforce by providing assistance such as help with paperwork and funding to secure childcare and transportation. Rise obtained funding from a Minnesota welfare program named the Minnesota Family Investment Program (also referred to as "Pathways"). Stewart's duties included the supervision of counselors who directly assisted clients.

Stewart's own performance was measured in part by the relative workforce participation rate for her office's clients compared to clients of other Pathways organizations. Throughout Stewart's employment, other offices closed, a state-government shut-down occurred, and workloads from different offices were consolidated. These events resulted in increased work for her office without a

commensurate increase in staffing. When Stewart began working at Rise, the workforce participation rate among clients was at a generally acceptable level.[1] By the time she was terminated, her office was second or third to last out of more than twenty similar offices in the Twin Cities.

Stewart's predecessor and successor in the supervisor position for her branch office both were American-born African-American women. Stewart's own supervisor, Truc Pham, worked out of a different Rise office and visited Stewart's branch for weekly staff meetings. Mary Stransky served as Rise's human resources director and, like Pham, did not work primarily in Stewart's branch office.

Stewart claims several male, Somali-born subordinates created a hostile work environment through sexist, racist, and nationalist comments and through physical violence and intimidation, all due to the fact that Stewart was an American-born African-American woman. The employees Stewart identifies as creating the hostile work environment include Abdi Haid, Youssouf Robleh, Abdisalon Abdirahman, Yasin Jama, and Stephanie Ableiter (a caucasian woman).[2] In support of her claims, Stewart relies on her own statements as presented in her affidavit, deposition testimony, and answers to interrogatories. She also relies on the deposition testimony, exit interview, and EEOC charge of Assata Damani, an American-born African-American woman. Damani worked at Stewart's Rise branch and resigned in March 2011, about a year before Stewart's termination. Damani alleged harassment by her male co-workers at a level that made her fear for her personal safety. We address in detail below the alleged instances of harassment.

---

[1]The parties agree that the workforce participation rate for clients of Stewart's Rise office, relative to the clients of other Pathways offices, is a tool for measuring performance and ensuring ongoing funding. The parties disagree as to the reasons the rate changed over time.

[2]The record does not reflect Ableiter's nationality.

In January 2012, Rise received an EEOC complaint from Damani. Around this time, Stewart was out of the office when Pham held a meeting with Stewart's staff. According to Pham and Stransky, the staff complained about Stewart's management style and Pham and Stransky believed there had been a complete breakdown in management and morale at the office. Pham asserts that he was concerned about the office's poor workforce participation rate and the possible loss of funding. Pham, Stransky, and Pham's supervisor, Donald Lavin, assert that they made the decision to terminate Stewart's employment. Pham and Stransky claim to have prepared a termination memo on January 23 or 24 that cited a steadily declining workforce participation rate as the reason for termination. The memo, which is part of the record in this appeal, lists January 27 as the termination date.

Before they delivered the memo to Stewart, however, Stewart's mother died and Stewart requested FMLA leave. In response, Pham and Stransky withheld the memo and granted the leave. Stewart worked on an intermittent basis for a few weeks and returned to mostly full-time work in late February 2012. While on FMLA leave, Stewart filed an EEOC complaint alleging a hostile work environment. Rise received the EEOC complaint prior to firing Stewart but after Pham and Stransky created the January 2012 memo.

According to Pham and Stransky, after Stewart had been back in the job and appeared to no longer require FMLA leave, they terminated her employment on March 12, 2012. A termination memo they provided to Stewart was essentially the same as the January 2012 memo but with additional details regarding the branch office's relative workforce participation rate.

Stewart eventually sued, asserting claims of hostile work environment, discriminatory termination, and retaliatory termination. She did not assert an FMLA-related claim. In describing the workplace environment, Stewart states that she reported instances of harassment to Pham and Stransky verbally. Pham largely denies

that Stewart made such reports, whereas Stranksy admits Stewart made reports. Some reported conduct on its face shows an animus based on race, sex or national origin; other reported conduct does not. Stewart admits she did not expressly label or identify all reported conduct as discriminatory.

The instances of harassment Stewart claims to have reported verbally to Pham or Stransky (or which Stewart claims they knew of through other sources) include[3]:

1.   Haid, Robleh, and Jama openly called Stewart a bitch. Jama regularly called Stewart a bitch.

2.   Robleh and Haid called Damani a bitch, screamed at Damani, and slammed doors in her face.

3.   Haid said, "African American women are bitches and that's why nobody likes you."

4.   Haid and Robleh said African-American women have no value.

5.   Haid yelled at Stewart, "F**k you, everyone around here does not like you."

6.   Robleh stood in the doorway to Damani's office with his pants unzipped. When Damani and another woman asked Haid to say something to Robleh, Robleh and Haid spoke in Somali and smiled, but Robleh did not correct the problem.

7.   Haid threw a case file at Stewart with enough force to push a phone book across her desk while screaming he would not take directions from her. Damani reported the incident to Pham, describing the incident as Haid throwing a book at Stewart's head. Damani also stated that Haid admitted the incident occurred and

---

[3]Although offset, the phrases are not quotations unless noted. This format is adopted for convenience.

that Haid said he would do it again. Stewart reported the incident to Stransky, who told Stewart she was "making a mountain out of a molehill." Stewart asked for Haid to be fired after the incident. Pham failed to fire Haid, and Stewart felt unable to have a subordinate discharged.

8. When Stewart would wear black clothing, Jama commented on her clothes asking if she was "looking for a husband or a man?" Robleh told Stewart and Damani, "women who wear black need a man" and also stated, "are you looking for a husband? Those are colors that you wear when you look for a man."

9. An audit of Robleh's files revealed forged client signatures and resulted in a requirement that Stewart sign Robleh's files. In response, Robleh stated of the female auditor that if he could get his "hands around her neck he would have choked her to death." And Haid described the female auditor, stating, "She's just a white woman; she doesn't know what she's doing."

10. Robleh's applications for clients' childcare became so poor that a county worker who reviewed the applications refused to take them without Stewart's review. Robleh then stated repeatedly in the office that he wanted to beat the county worker to death. He also stated his applications would not go through because Stewart and Damani were having an affair with the county worker, "a white man." Damani complained about the threats to Pham, but Pham denied she made such complaints. Later, at a staff meeting, someone raised Robleh's threats, and Pham called them "inappropriate." Stransky admitted learning of Robleh's complaints, but Stransky characterized them as "just part of the job."

11. Abdirahman entered Stewart's office and stood over her in an intimidating manner. Pham instructed Abdirahman not to meet in Stewart's office.

12. Robleh, Haid, and Jama refused to answer phones, describing the task as "women's work."

13. After a cut in funding, janitorial service was reduced. Stewart developed a rotating schedule for workers to clean the bathroom, but the male counselors refused, calling it "women's work." When Stewart confronted Robleh and Haid about this, they spoke in Somali, but Stewart heard her name and "bitch." She also heard them refer to her as "maid."

14. Many of the male Somali counselors used the office as a community center, entertaining non-clients, using office resources, and visiting purportedly insecure foreign-language internet news sites, thus compromising office computers. These men refused Stewart's demands to change this behavior, and Pham and Stransky failed to aid in Stewart's efforts to reign in this behavior.

15. At a staff meeting with Pham and Stransky present, supervisors addressed behavior. Robleh yelled at Stransky and Pham and hit a desk saying, "You are not going to treat me like this." According to Damani, Stransky turned pale, Damani told Stransky Robleh scared her, and Stransky told Damani she would talk to Stewart. Stransky, however, denies anyone expressed safety concerns about Robleh.

16. According to Damani, Robleh and Haid stated, "American women were disrespectful because they were not beaten enough." And Jama stated, "American women were out of control." Damani asserts that she complained to Pham who responded the comments were inappropriate. Pham denies either Damani or Stewart raised concerns about such statements.

17. Ableiter refused to take instruction from Stewart, yelled at Stewart, and discriminated against African-American clients. At least one client complained via letter that was sent to Stransky.

18. Stewart sought to terminate Ableiter but was told by Stransky that she lacked the authority to terminate Ableiter.

19. And finally, in one instance, Robleh believed Damani was standing in a particular location so as to eavesdrop on his conversations. He grabbed Damani's arm, pushed her against a wall, threatened her, and accused her of eavesdropping. Damani reported the incident to Stewart, and Stewart reported it to Stransky.

Many of the claims of verbal reports to Pham and Stransky exist only in Stewart's affidavit, answers to interrogatories, or deposition. Stewart claims, for some reports, that she followed up with emails to Pham or Stransky. Stewart, however, did not pursue electronic discovery relating to her work email or the emails of Pham and Stransky. As described above, Damani confirmed several of the incidents and referenced discussions with Pham or Stransky about the incidents.

Many of the claims also are corroborated based on Stransky's deposition or undated notes Stransky admits are hers. These notes state[4]:

She's not getting involved. The guys run to Truc.

She thinks they don't want to take direction from a female.

In resource room looking for files—Assata said—she couldn't talk to him and she told Bernadine he was pushing on me.

Assata complaining I don't want to leave—I'm not a quitter don't want to take this anymore.

Stephanie treated people of color much worse than whites.

---

[4]The contents of Stransky's informal notes are excerpted quotes presented without further notation of omissions and without correction.

Abdi Haid—Yasin—wearing orange you look like a fat orange

Yousouf—when you are wearing all black—you are looking for a man

"bitch" to my back

Kay Hanahan—glad you're here because Amina & the guys would curse "women shouldn't work & should stay home"

"Yousouf & Abdi told Assata that whatever goes on in the office—don't tell Bernadine or there would be a consequence."

"All the men would wait for women to answer phones"

Stransky stated in her deposition that several people from Stewart's branch office had made her aware of Robleh and Ableiter's yelling and Robleh's threats regarding the county worker. Stransky also stated she discussed the threats with Pham, although Pham stated in his own deposition that he had no knowledge of the threats. Stransky discussed the notes quoted above, could not recall the dates on which she wrote the notes, but described who made the various comments. She also described discussing several of the items with Pham. Pham, however, denied receiving reports of such behavior.

When Damani quit her job as a counselor, she completed an exit interview form dated March 11, 2011. The form states three reasons for leaving: (1) Work conditions: "threats and harassment"; (2) Health reasons: "constant and consistent pain"; and (3) Other: "Treatment by male coworkers." Among other statements in the lengthy form, Damani concluded, "They are aware that women are treated differently because of the male dominated culture. (Witnessed by others [sic] coworkers). Some making threats of violence against others. Contributing to the unsafe environment." Stransky received the form and discussed the form with Pham. In a deposition, Damani corroborated many of Stewart's claims, indicated she was present at meetings

where she or Stewart told Pham of their concerns, and indicated Pham told them to attribute the behavior to "cultural differences."

Notwithstanding these allegations and descriptions of harassment, Stewart signed certifications in January 2007, September 2007, April 2008, March 2009, March 2010, and October 2011, all of which stated:

> This is to certify that I have received and read the Rise, Incorporated Code of Conduct. To the best of my knowledge, I am unaware of any possible violation of the standards described in the attached Code of Conduct and/or potential conflict of interest, either by me, managers, supervisors, or other employees. I further agree to comply with the standards in the future and to report promptly any questions or concerns that I may have, as noted in the Code. I understand that non-compliance of this policy will result in consequences up to and including termination.

The Code of Conduct referenced in these certifications stated, "Rise prohibits discrimination of any kind. Discrimination of any employee on the basis of race, color, creed, religion, sex, sexual orientation, national origin, age, [or] disability . . . is against the law and will not be tolerated."

A separate, conflict resolution policy in a Rise employee handbook provided for a graduated system of conflict resolution that (when necessary and possible) called for a complaining party to progress sequentially from reports to human resources or direct supervisors up to higher levels of management with written complaints requested for situations where the initial reports failed to resolve the problem.

Stewart does not deny signing the annual certifications regarding an absence of Code of Conduct violations. She also does not claim to have followed the separate, graduated, oral-then-written reporting system described in the handbook for

-10-

any of her complaints, conflicts with her subordinates, or conflicts with her superiors. Finally, she does not claim to have memorialized her concerns or raised the concerns in performance reviews for the subordinates.

Based on the foregoing, Rise moved for summary judgment.

B. District Court Decision

The district court first addressed Stewart's claim of discriminatory termination. Applying the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973), the court held Stewart could not establish a prima facie case because, by the time of her termination, she had become unqualified for her position—she was not meeting the legitimate expectations of her employer. The court cited performance reviews from 2009–2011 that criticized Stewart's interpersonal and leadership skills. The court also cited references in these performance reviews to a decreasing and unacceptable workforce participation rate among the clients of Stewart's office.

The district court also held Stewart failed to establish a prima facie case because she did not establish that her termination occurred in circumstances capable of giving rise to an inference of discrimination. In reaching this separate conclusion, the court discounted Stewart's affidavit and deposition testimony as "self-serving." The court also noted the absence of written complaints and Stewart's failure to use the Rise conflict-resolution framework. Finally, the court discounted remarks by co-workers as "stray remarks by non-decisionmakers." The district court continued its analysis, finding for essentially the same reasons that even if Stewart had established a prima facie case, Rise articulated a legitimate rationale for Stewart's termination (the low workforce participation rate) and Stewart failed to prove this rationale was pretextual.

-11-

Regarding the hostile-work-environment claims, the district court granted summary judgment for two alternative reasons. First, the court held the alleged incidents were not sufficiently severe or pervasive to establish a hostile work environment; the court characterized the incidents as isolated and stated Stewart failed to show they occurred because of race, national origin, or sex. In reaching this conclusion, the court described Stewart's affidavit and deposition testimony as "self-serving" and as lacking written documentation or support.

Alternatively, the court held Rise was entitled to rely on the affirmative defense of Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998). This defense protects an employer from hostile work environment claims if (1) the employer exercised reasonable care to avoid, prevent, and promptly correct harassing behavior; and (2) the employer made preventative or corrective opportunities available; but (3) the employee failed to take advantage of such opportunities. Ellerth, 524 U.S. at 765. The court held the existence of Rise's Code of Conduct, conflict resolution procedure, and various other protections coupled with Stewart's annual certifications and her failure to make written complaints brought the case within the Ellerth/Faragher defense.

Regarding the state and federal retaliation claims, the court credited Pham and Stransky's assertion that they made the termination decision in January prior to Stewart's FMLA leave and prior to receiving Stewart's EEOC charge. The court also noted that, even if Stewart's retaliation claims were based on her alleged earlier verbal reports of harassment, the concerns about Stewart's performance and the decreasing workforce participation rate preceded any alleged reports. Stewart appeals.

II. Discussion

We review a grant of summary judgment de novo, construing the record in the light most favorable to the nonmoving party. Rickard v. Swedish Match N. Am., Inc., 773 F.3d 181, 184 (8th Cir. 2014).

A.      Discriminatory Termination

Regarding the claim of discriminatory termination, summary judgment was appropriate due to Stewart's failure to establish a prima facie case, albeit for reasons different than articulated by the district court. See Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999) ("We may uphold a grant of summary judgment for any reason supported by the record, even if different from the reasons given by the district court."). As noted, Stewart's predecessor as branch manager, as well as her successor, were American-born African-American women. Therefore, focusing specifically upon the circumstances of Stewart's actual termination by Pham, Stransky, and Lavin, we find little support for an inference that discrimination by these decisionmakers motivated the termination.

To the extent Stewart points to instances of harassment by her own subordinates (and a lack of response or support from her own supervisors) as evidence of a discriminatory motive in her termination, her claim simply collapses into her hostile-work-environment theory. Stewart's subordinates were not the decisionmakers in this case. Her own superiors may have failed to remedy or assist in an arguably untenable and hostile situation. Their inaction when asked to protect Stewart—a lower-level supervisor—from mistreatment by her own subordinates, however, does not give rise to a reasonable inference that they too harbored a discriminatory animus and fired her for a discriminatory reason.

-13-

In this regard, we have held evidence that a decisionmaker tolerated a hostile environment can be relevant to the question of whether that decisionmaker later terminated an employee due to a discriminatory motive. See Williams v. ConAgra Poultry Co., 378 F.3d 790, 794 (8th Cir. 2004) ("Evidence of widespread toleration of racial harassment and disparate treatment condoned by management was relevant to its motive in firing Mr. Williams. We believe that evidence of racial bias in other employment situations could permissibly lead to the inference that management was similarly biased in the case of Mr. Williams's firing."). Although such evidence may be relevant in a mine-run discriminatory termination case, we do not believe it sufficient to create a triable question of fact in this case. Here, the terminated employee herself was a supervisor over the alleged offenders, and members of the same protected class preceded and followed her in the exact same supervisory position. Williams, in contrast, involved express racial harassment by managers including quid pro quo harassment with benefits extended to female African-American employees who responded favorably to "sexually suggestive remarks." Id. at 793.

The only evidence tethering Stewart's discriminatory termination claim to a suggestion of a prohibited animus is the evidence of the hostile work environment. We conclude the evidence Stewart cites in support of her hostile-work-environment claim speaks directly to that claim. It does not, in the unique circumstances of this matter, establish a prima facie case of discriminatory termination. We therefore affirm the district court's grant of summary judgment on the discriminatory termination claim.

B. Hostile Work Environment

As an initial matter, we reject summary judgment based on application of the Ellerth/Faragher defense in this case. Questions of fact abound as to the dates of events and reports, the relationship between the Code of Conduct and the conflict-

-14-

resolution policy, and the meaning and consequences that should be attached to Stewart's annual Code of Conduct certifications to Rise. Therefore, although Stewart's annual certifications and her failure to pursue a formal written system of grievances may well be outcome determinative in the minds of jurors, they are not determinative as a matter of law. See Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam) ("By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party." (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986))).

Turning to the merits of the hostile work environment claim, Stewart must prove "1) she belongs to a protected group; 2) she was subjected to unwelcome harassment based on [membership in that group]; 3) the harassment affected a term, condition, or privilege of her employment; 4) her employer knew or should have known of the harassment; and 5) the employer failed to take proper action." Peterson v. Scott Cnty., 406 F.3d 515, 523–24 (8th Cir. 2005), abrogated on other grounds by, Torgerson v. City of Rochester, 643 F.3d 1031, 1059 (8th Cir. 2011) (en banc). "To be actionable, [the] 'objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Clearwater v. Ind. Sch. Dist. No. 166, 231 F.3d 1122, 1128 (8th Cir. 2000) (quoting Faragher, 524 U.S. at 787). "[T]o determine whether an environment is sufficiently hostile or abusive, [we look] 'at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher, 524 U.S. at 787–88 (quoting Harris v. Forklift Sys., Inc., 501 U.S. 17, 23 (1993)). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 788.

The record provides adequate support for the first, second, and fifth elements of Stewart's hostile work environment claim. Stewart was subject to unwelcome harassment based on her sex, race, and/or national origin. Rise took little or no action to improve the situation.

The severity of the harassment and whether Rise knew or should have known of severe harassment present closer calls. According to Stewart, Pham witnessed first-hand instances of insubordination and intimidation. Stewart claims via affidavit and deposition testimony that she reported instances of harassment due to the fact that she was an African-American woman. Stewart also relies on corroboration from Stransky's deposition and notes, inconsistencies in Stransky and Pham's depositions, and corroboration from Damani's exit interview, deposition testimony, and EEOC complaint.

Rise, on the other hand, downplays the significance of Stewart's affidavit, calling the affidavit self-serving and arguing it should not be considered for summary judgment purposes. Rise also points to Stewart's annual certifications through 2011 and Stewart's failure to make a written complaint using Rise's conflict resolution system. Finally, Rise emphasizes that Stewart served as the front-line supervisor of the offending employees; she was therefore responsible for dealing with situations as they arose and reporting concerns up the chain of command. In her deposition, Stransky repeatedly stated that Stewart was in charge of the branch office and needed to remedy the reported issues herself.

Through this lens, Rise views Stewart as a supervisor who presided over a group of insubordinate and offensive employees whose conduct amounted to a series of isolated events. Rise describes Stewart as a hyper-sensitive micro-manager who could not deal with criticism and failed to adequately report the frequency and severity of the offensive conduct. Rise also characterizes the offending employees'

overt hostility towards Stewart as based on a communal personal dislike of Stewart and frustration with her management style.

A jury may very well accept Rise's narrative. We may not, however, discount evidence as urged by Rise, nor may we view the facts in the light Rise suggests. The Federal Rules of Civil Procedure expressly contemplate the use of affidavits, depositions, interrogatory answers, and declarations as permissible forms of evidence at the summary judgment stage. Fed. R. Civ. P. 56(c)(1)(A) & (c)(4). Neither the absence of written reports nor the self-serving nature of affidavits, interrogatory answers, or deposition testimony serve to make such evidence inherently infirm. As such, we generally do not discount such evidence at the summary judgment stage.

We may discount a plaintiff's self-serving affidavit or deposition testimony as a matter of law where it clearly contradicts the plaintiff's earlier testimony under oath and where the plaintiff offers no explanation for the inconsistencies. See Frevert v. Ford Motor Co., 614 F.3d 466, 474 (8th Cir. 2010) ("We have previously 'held that the plaintiff did not create a genuine issue of material fact simply by submitting an affidavit that contradicted testimony at a prior deposition, where there were no legitimate reasons for the filing of an inconsistent affidavit.'" (quoting Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1126 (8th Cir. 2008) (internal quotation marks omitted))). Here, however, the alleged inconsistencies are unclear and the earlier, purportedly inconsistent evidence is not prior testimony. The alleged inconsistencies include: (1) the annual certifications as contrasted with the claimed verbal reports of harassment; and (2) the failure to consistently reference animus based on race, sex, or national origin in the claimed verbal reports to Pham and Stransky. These nuances simply do not reach the level of assertions that "directly contradict[]" testimony under oath and that might support the discounting of evidence as a matter of law. Id. The impropriety of discounting such evidence becomes clear in light of the facts that: (1) the evidence Rise seeks to discount is at least partially corroborated by Stransky's deposition testimony and notes; (2) it is partially corroborated by Damani's EEOC

charge, exit interview, and deposition testimony; and (3) Pham's denial of knowledge contradicts Stransky's testimony, thus lending credence to Stewart's claims. Further, the last certification occurred in October 2011, and there is no allegation that the hostile conduct directed towards Stewart had ceased between that date and Stewart's March 2012 termination.

Taken in a light most favorable to Stewart, then, a different narrative emerges. She reported many instances of harassment as harassment, and other instances as insubordination and inappropriate behavior. To support a hostile-work-environment claim, every instance of unwelcome conduct need not, individually, point to a prohibited animus. See Carter v. Chrysler Corp., 173 F.3d 693, 701 (8th Cir. 1999) (indicating that not every individual hostile act needs to, overtly and standing alone, show an impermissible motive because certain acts, like the use of epithets "may . . . create an inference that racial animus motivated other conduct as well"); Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997) ("Not every aspect of a work environment characterized by hostility and intimidation need be explicitly sexual in nature to be probative."). Similarly, not every instance of offending conduct must rise to the level of severity required to support a claim. See id. ("A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it into a series of discrete incidents." (citation and internal quotation marks omitted)). Rather, an overall pattern of conduct must be considered when assessing the sufficiency the entire claim as to both severity of the harassment and adequacy of the reporting. See Harris, 510 U.S. at 23 (instructing that hostility must be determined by "looking at all the circumstances").

Taken collectively, Stewart has shown enough to avoid summary judgment. A jury could conclude the comments at issue were neither off-hand nor isolated. According to Stewart and Damani, the comments were a consistent pattern of verbal abuse based upon sex, race, or national origin often tied to overt acts of intimidation, violence, or insubordination. Together with the general and open insubordination,

the threats against county workers and auditors, the intimidating stances, the throwing of a file, and the grabbing of Damani, the conduct may be viewed as amounting to an actionably severe hostile work environment.

Further, the reports to Stransky and Pham need not each reference a prohibited animus. Many of the reports expressly included such references or identified conduct or statements that required no further explanation to show the prohibited animus. Reports that lacked facial animus or express explanations cannot be quarantined and viewed in isolation. See Hathaway, 132 F.3d at 1222. And, as to Rise's assertion that written rather than oral complaints were required, there is no general requirement in the law that complaints be in a particular prescribed form. Rather, to show co-worker harassment, an employee must show "that [her employer] knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to stop the harassment." Carter, 173 F.3d at 702.

That is not to say we believe this is an easy case. When the plaintiff is a supervisor, and the objected-to conduct originates among her subordinates, a jury may look with great suspicion upon claims that the plaintiff adequately presented her concerns up the chain of command. Under Tolan v. Cotton, however, we may not indulge in the discounting or weighing of evidence as requested by Rise. United States ex rel. Miller v. Weston Educ., Inc., 784 F.3d 1198, 1206 (8th Cir. 2015) ("But at summary judgment this court examines whether there is a genuine issue of material fact; it does not weigh the evidence or decide credibility.").

C. Retaliation

Stewart presents a federal retaliation claim under 42 U.S.C. § 2000e-3(a), and a state retaliation claim under a Minnesota whistleblower statute, Minn. Stat. § 181.932, subd. 1. We analyze both types of claims under the McDonnell Douglas burden-shifting framework. See McDonald v. City of St. Paul, 679 F.3d 698, 707

-19-

(8th Cir. 2012) (applying the framework to claims under Title VII and the Minnesota Human Rights Act); Hitchcock v. FedEx Ground Package Sys., Inc., 442 F.3d 1104, 1106 (8th Cir. 2006) (applying the framework to a claim under § 181.932).

Pham, Stransky, and Lavin claim to have made the decision to terminate Stewart in January 2012, prior to Stewart's filing of her February 2012 EEOC complaint. Pham and Stransky claim to have memorialized this intent in the memo created on January 23 or 24 that listed January 27 as a termination date. Finally, they assert that they withheld the memo at that time out of humanitarian concern for Stewart who asked for and received FMLA leave due to her mother's death.

Although Stewart argues the termination decision came at a later date, there is no evidence to rebut Rise's assertion of the January decision date. Stewart's retaliation claim based on the February EEOC complaint therefore fails.

We reverse the grant of summary judgment to rise on the hostile-work-environment claim, but affirm in all other respects.

_____