# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 11-3599

_____

United States of America,          *
                                   *
              Appellee,            *
                                   *   Appeal from the United States
       v.                          *   District Court for the
                                   *   Western District of Missouri.
Johun L. Anderson,                 *
                                   *
              Appellant.           *

_____

Submitted: June 13, 2012
Filed: August 1, 2012

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

Johun L. Anderson appeals the district court's[1] denial of his motion to suppress drugs and weapons found in an apartment he entered after fleeing from police during a "buy/bust" operation. Anderson entered a conditional guilty plea to (1) possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and (2) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Exercising his

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

reserved right to appeal the suppression ruling, Anderson argues the actions by law enforcement officers during the "buy/bust" operation violated his Fourth Amendment rights and tainted the search warrant affidavit used to seize the drugs and weapons from the apartment. We affirm.

I

On August 21, 2008, Manuel Anchondo, an undercover detective with the Kansas City, Missouri, Police Department's Street Narcotics Unit ("SNU"), arranged to purchase cocaine base from Dion Brown in the approximate area of Ninth and Gladstone. Brown instructed Anchondo to call upon arrival. Anchondo had made two prior purchases of cocaine base from Brown, and he had obtained Brown's telephone number after the initial purchase. Anchondo called Brown when he arrived. Shortly after, Anderson exited an apartment at 815½ Gladstone and approached the detective's undercover vehicle.

Anderson entered the officer's vehicle and sold several grams of cocaine base to the detective. Anchondo then notified police surveillance crews it was a "good deal" and to "send the crews for the buy/bust." As he drove away, he observed Anderson, through his rearview mirror, walking back toward the apartment building.

Matthews Masters, a Kansas City, Missouri, police officer also assigned to the SNU, was positioned near Ninth and Gladstone with four other officers in two unmarked patrol vehicles. When they received confirmation the drug sale had occurred, Masters turned the corner and saw Anderson "standing on the sidewalk in front of the building." Masters did not witness the drug transaction, but identified Anderson by the description Anchondo had provided: a black male with braided hair, shirtless, and wearing blue bandanna-patterned slippers.

When Anderson observed the officers, he "took off running toward the common door of the apartment building." Two officers, Larry Weimhold and Justin Crump, immediately followed Anderson. Anderson proceeded to run up the stairs onto the front porch of the apartment building and entered the common door.

Weimhold and Crump pursued Anderson into the building. As Masters approached the building, he observed, through an open window, Anderson running up the stairs. Masters then saw Anderson run up the second flight of stairs and enter the north apartment unit. Because Crump and Weimhold were initially unable to determine which upstairs apartment unit Anderson had entered, they began knocking on doors and announcing, "Police," repeatedly. Masters then ascended the stairs and told the two officers that Anderson had run into the north apartment.

Masters proceeded to open a window in the hallway of the second floor, and along with Weimhold, stepped onto the balcony of the north apartment unit. When the officers looked into the north apartment, they observed two black males and a white female moving "back and forth between rooms, and it was hurried movements."

At the same time, a woman later identified as Shiloh Horn, approached the apartment building and told the officers she was the renter of the north apartment. Masters then left the balcony and explained to Horn that the officers were conducting a "buy/bust" operation and the subject had fled into her apartment. Horn responded by saying the only person who should be in her apartment was her boyfriend, later identified as Anderson. Masters asked Horn if the officers could go into her apartment, and Horn said "she was more than willing to let the officers go in and get those people out of her apartment."

Before handing the key over to Masters, Horn asked if she could call her boyfriend and see if he was inside the apartment. Horn made the call and informed Masters that Anderson was inside the apartment. Masters then asked Horn if she

-3-

would ask Anderson to come out of the apartment. Horn called Anderson again, and about one minute later, Anderson opened the apartment door.

The officers then detained Anderson and two other individuals, Brown and Samantha Tigner, just inside the front door of the apartment. The three individuals were taken out of the building. Anchondo then drove by on the street and identified Anderson as the person who had made the drug sale earlier that evening.

Masters asked Horn for consent to do a protective sweep to ensure that no other individuals were still in the apartment. Horn consented. During the sweep, the officers observed crack cocaine lying on a bed, plastic baggies swirling inside of a toilet bowl, and the butt of a rifle in an opened closet. The officers did not immediately seize the items, and Horn was told law enforcement officers were going to seek a search warrant for the apartment.

A search warrant was obtained later that evening. The search recovered the items previously mentioned, as well as a High-Point 9-millimeter rifle, a 9-millimeter Ruger handgun, twenty-three rounds of live 9-millimeter ammunition, two digital scales, two cell phones, and $2,900 in United States currency.

On May 20, 2009, Anderson and Brown were charged in a three-count indictment with (1) conspiracy to distribute fifty grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, (2) possession with intent to distribute fifty grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and (3) possession of two firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).

Anderson filed a motion to suppress the evidence seized pursuant to the search warrant, which the district court denied. On April 26, 2011, as part of a conditional plea agreement, Anderson pleaded guilty to possession with intent to distribute five

or more grams of cocaine base and possession of a firearm in furtherance of a drug trafficking crime. Anderson was sentenced to consecutive terms of 120 and 60 months' imprisonment, respectively.

## II

### A. Standard of Review

When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Davis, 457 F.3d 817, 822 (8th Cir. 2006). "We may affirm the district court's denial of a motion to suppress on any ground the record supports." United States v. Pratt, 355 F.3d 1119, 1121 (8th Cir. 2004).

### B. The Denial of Anderson's Motion to Suppress

Anderson argues the district court erred in denying his motion to suppress because law enforcement officers violated his Fourth Amendment rights at three points in time during the "buy/bust" operation: (1) the entry onto the apartment balcony by Masters and Weimhold, (2) the entry into the apartment to detain Anderson, and (3) the "protective sweep" conducted by the officers after detaining Anderson. Anderson asserts each of these alleged Fourth Amendment violations by police tainted the affidavit used to obtain the search warrant to seize the drugs and weapons from the apartment.

The Fourth Amendment shields individuals from unreasonable searches and seizures by law enforcement. United States v. Ramirez, 676 F.3d 755, 759 (8th Cir. 2012). "[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions[.]" Coolidge v. New Hampshire, 403 U.S. 443,

474 (1971). Those exceptions to the Fourth Amendment's warrant requirement include "hot pursuit of a fleeing subject," and a variety of other exigent circumstances, including "the need to prevent the imminent destruction of evidence." Kentucky v. King, 131 S.Ct. 1849, 1856 (2011) (internal quotation marks and citation omitted). Voluntary consent of the person whose home or property has been searched is another recognized exception. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

### 1. Hot Pursuit

First, Anderson asserts the search warrant was improperly issued because the supporting affidavit was tainted by evidence gathered from the officers' observations made from the balcony of the apartment into which Anderson fled. We disagree.

As a preliminary matter, the search warrant affidavit did not explicitly or implicitly refer to the observations by the detectives while on the balcony. Therefore, the affidavit could not have been tainted by the officers' observations on the balcony. However, because the parties address this issue at length, we consider below whether the officers entry onto the balcony was unlawful.

"Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." King, 131 S.Ct. at 1856. "Hot pursuit can, without more, justify a warrantless entry." United States v. Schmidt, 403 F.3d 1009, 1015 (8th Cir. 2005). In Welsh v. Wisconsin, 466 U.S. 740, 753 (1984), the Supreme Court instructed us to consider two factors in determining whether "hot pursuit" creates an exigency: (1) the gravity of the underlying offense, and (2) whether the government can demonstrate an "immediate or continuous" pursuit of the suspect from the scene of the crime.

The first factor, the gravity of the underlying offense, establishes the officers' entry onto the balcony of the apartment was lawful because Anderson had committed

the "serious offense" of drug trafficking prior to fleeing the scene of the exchange. In United States v. Clement, 854 F.2d 1116 (8th Cir. 1988), we held "cocaine trafficking is . . . a serious offense." Id. at 1120. Where the police attempt to make an arrest for a "serious offense" in a public place, they may pursue the suspect into a private home or business without obtaining a warrant. King, 113 S.Ct. at 1856; United States v. Santana, 427 U.S. 38, 43 (1976); Minnesota v. Olson, 495 U.S. 91, 100-01 (1990); Welsh, 466 U.S. at 753 (1984); see also Schmidt, 403 F.3d at 1013-15; United States v. Reed, 733 F.2d 492, 499-504 (8th Cir. 1984). Therefore, because the police were in pursuit of Anderson for committing the "serious offense" of drug trafficking, the government satisfies the first prong of the "hot pursuit" inquiry.

The government must also demonstrate, however, there was an "immediate or continuous" pursuit of Anderson that justified the officers entry onto the balcony of the apartment. In Welsh, the Supreme Court held the pursuit of an individual suspected of operating a motor vehicle while intoxicated to his home and into his bedroom, after spending time discussing the events with the sole witness, was not "immediate or continuous" pursuit of the suspect from the scene of the crime. 466 U.S. at 753. The Court held the arrest to be unlawful because no adequate exigent circumstances existed to justify the warrantless entry into the suspect's home. Id.

This case, however, is distinguishable from Welsh. The "buy/bust" cocaine transaction between Anchondo and Anderson occurred on a public street, and Anderson fled into Horn's apartment building upon seeing the police. The police immediately pursued Anderson into the apartment building and followed him to the upstairs apartment units. As the officers actively pursued Anderson, they entered the apartment balcony to get a visual on Anderson. Further, unlike the officers in Welsh, the officers here did not, at any point, give up the pursuit. The police immediately and continuously pursued Anderson after he fled the scene of the drug transaction, and the police were justified in entering the balcony of the apartment under the doctrine of "hot pursuit."

Because Anderson had committed a "serious offense" by selling cocaine base to Anchondo, and because the police immediately and continuously pursued Anderson after the transaction, under the standard articulated by Welsh, the police entered the balcony of the apartment lawfully. As a result, the observations by the officers while on the balcony did not taint the search warrant affidavit.

## 2. Voluntary Consent to Enter the Apartment

Second, Anderson argues the officers did not have voluntary consent from Horn to enter the apartment, and the district court erred in crediting Master's testimony over Horn's testimony. We disagree.

The prohibition against a "warrantless entry of a person's home . . . does not apply . . . to situations in which voluntary consent has been obtained[.]" Rodriguez, 497 U.S. at 181. Consent may be obtained directly from a defendant, or as in this case, "from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974).

When Horn, the lessee of the apartment where Anderson had fled, arrived on the scene, the police had not entered the apartment, and two officers were stationed on the balcony. After being notified of Horn's arrival, Masters left the balcony and went downstairs to talk to her. Under the district court's findings of fact, Horn told Masters only her boyfriend, later identified as Anderson, was supposed to be in the apartment, and asked the officers if she could call him to see if Anderson was in the apartment. Horn also stated "she was more than willing to let officers go in and get those people out of her apartment." After a second call from Horn to Anderson, Anderson opened the door to the apartment, and the police then detained him along with the other two individuals. Additionally, the district court found Masters asked

for Horn's consent to walk through the apartment to ensure no other individuals were in the apartment, and Horn consented to the protective sweep.

Anderson asserts Horn did not cooperate with Masters and did not give consent. He also questions Masters's credibility. However, a district court's credibility determination after a hearing on the merits of a motion to suppress is virtually unassailable on appeal. See United States v. Vanover, 630 F.3d 1108, 1114 (8th Cir. 2011).

The district court upheld the magistrate judge's credibility determinations regarding the conflicting testimony of Masters and Horn. The magistrate judge made the credibility determination by considering (1) the demeanor of the witnesses on the stand, (2) the interests the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done. Because of Horn's relationship with Anderson and her changing story regarding the events that took place, the district court accepted the magistrate judge's finding that Masters was more credible than Horn. As there is substantial evidence in the record to support this finding, the district court did not commit clear error in crediting Masters's testimony.

Because the district court did not commit clear error in crediting Masters's testimony, and because Horn gave voluntary consent to search her apartment, the officers' entry into the apartment to detain Anderson was lawful.

### 3. Voluntary Consent to the Protective Sweep

Finally, Anderson argues the "protective sweep" conducted by the officers after Anderson was detained violated his Fourth Amendment rights. Anderson asserts the protective sweep tainted the search warrant affidavit, which contained a description of the drugs and rifle the police observed during the sweep. We disagree.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). In Buie, the Supreme Court held a protective sweep does not violate the Fourth Amendment "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." Id. (internal quotation marks and citation omitted).

Something more than a speculative hunch is required for police to conduct a protective sweep. We have held protective sweeps are permissible when additional factors, such as voluntary consent, are present. See United States v. Comstock, 531 F.3d 667, 676 (8th Cir. 2008) (stating the protective sweep was justified where the police had voluntary consent from the defendant to conduct the protective sweep); United States v. Jones, 193 F.3d 948, 950 (8th Cir. 1999) (concluding a protective sweep was permissible because a third party gave voluntary consent).

As in Comstock and Jones, the officers here had voluntary consent from Horn to conduct the protective sweep. Horn expressly authorized Masters to do a protective sweep, specifically allowing the officers to walk through the apartment to ensure that no other individuals were in the apartment.

Because the officers had voluntary consent from Horn to conduct the protective sweep, the officers lawfully searched Horn's apartment, and the search warrant affidavit was not tainted by the protective sweep.

III

We affirm the district court's denial of Anderson's motion to suppress.

_____