FILED
United States Court of Appeals
Tenth Circuit

August 24, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NICOLE ATTOCKNIE, personal
representative of the estate of Aaron Scott
Palmer, as mother and next friend of
M.P., a minor child, and individually,

     Plaintiff - Appellee,

v.

SHANNON SMITH, individually and in
his official capacity as Sheriff of
Seminole County, Oklahoma,

     Defendant - Appellant,

and

KENNETH CHERRY; TAMMY WALL,
individually and in her official capacity as
Administrator of Seminole County
Special Programs,

     Defendants.

No. 14-7053

---

NICOLE ATTOCKNIE, personal
representative of the estate of Aaron Scott
Palmer, as mother and next friend of
M.P., a minor child, and individually,

     Plaintiff - Appellee,

v.

No. 14-7054

KENNETH CHERRY,

     Defendant - Appellant,

and

SHANNON SMITH, individually and in his official capacity as Sheriff of Seminole County, Oklahoma; TAMMY WALL, individually and in her official capacity as Administrator of Seminole County Special Programs,

     Defendants.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 6:13-CV-00158-JHP)**

---

Richard N. Mann, Assistant Attorney General, Oklahoma City, Oklahoma, for Defendant - Appellant Kenneth Cherry.

Jordan L. Miller (Chris J. Collins and Philip W. Anderson, with him on the briefs), Collins, Zorn & Wagner, P.C., Oklahoma City, Oklahoma, for Defendant - Appellant Shannon Smith.

Jack Mattingly, Jr., Mattingly & Roselius, PLLC, Seminole, Oklahoma, (Tanner W. Hicks, Oklahoma City, Oklahoma, with him on the briefs), for Plaintiff - Appellee Nicole Attocknie.

---

Before **HARTZ**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

On August 25, 2012, Aaron Palmer was shot dead by Deputy Sheriff Kenneth Cherry immediately after Cherry barged into Aaron's home in Seminole, Oklahoma. Having been commissioned by Seminole County Sheriff Shannon Smith, Cherry was serving as a compliance officer for the county's drug-court program. He was at Aaron's house to execute a year-old bench warrant for the arrest of Aaron's father, Randall Palmer, for failure to appear in court and failure to comply with his performance contract with the drug court. Cherry thought he saw Randall in Aaron's garage earlier in the day, and he arranged for support from other law-enforcement officers to apprehend Randall. When he returned to the area with other officers, he allegedly saw somebody who appeared to be Randall running through the garage into the house. He then sped to the front door of the house with gun drawn, pushed the door open, and fired his gun at Aaron, who was standing a few feet from the door, allegedly with a knife in his hand. Randall was not found on the premises.

Aaron's widow, Nicole Attocknie (Plaintiff), brought suit under 42 U.S.C. § 1983 on behalf of herself, Aaron's child, and Aaron's estate in the United States District Court for the Eastern District of Oklahoma. The suit claimed that (1) Cherry violated Aaron's Fourth Amendment rights by unlawfully entering the house and using excessive force, and (2) Smith (who was not present when Aaron was shot) violated Aaron's Fourth Amendment rights by failing to train or supervise Cherry.[1] Cherry and Smith both raised

---

[1] Other claims were brought but are not at issue on appeal.

3

the defense of qualified immunity, but the district court denied their motions for summary judgment. On appeal Cherry argues that he is entitled to qualified immunity on the grounds that his entry into Aaron's house was justified by a hot pursuit of Randall (or at least the law was not clearly established to the contrary in August 2012) and that his use of force was appropriate in the face of a deadly weapon (the knife allegedly in Aaron's hand). Smith argues for qualified immunity on the ground that his failure to train or supervise Cherry did not show deliberate indifference to Aaron's constitutional rights.

We affirm the denials of qualified immunity to Cherry and Smith. Hot pursuit is the sole justification offered by the defendants for Cherry's entry of Aaron's home. But Plaintiff presented sufficient evidence that Cherry was not in hot pursuit of Randall when he entered the home and that the entry was therefore unlawful. And because the use of force would only have been necessary as a result of the entry, a jury could properly find that the unlawful entry caused Aaron's death. We therefore need not address whether the force used by Cherry upon his entry was in itself unreasonable and excessive. As for Smith, he cannot obtain relief on the only grounds he preserved in district court because they are based on a view of the evidence rejected by the district court.

We first discuss the doctrine of qualified immunity and our jurisdiction. We next address the facts and law relevant to Cherry's defense of qualified immunity and then we address Smith's defense.

## I.   QUALIFIED IMMUNITY AND JURISDICTION

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).  The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*  If a defendant asserts qualified immunity, the plaintiff has the burden to show that "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established" at the time of the challenged conduct.  *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012) (internal quotation marks omitted); *see Pearson*, 555 U.S. at 232.  In general, "[t]he law is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as plaintiff maintains." *Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010) (internal quotation marks omitted).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (internal quotation marks omitted).  We review de novo the denial of a summary-judgment motion based on qualified immunity.  *See Morris*, 672 F.3d at 1189.

Some of the usual rules governing appellate jurisdiction do not apply in the qualified-immunity context. Under 28 U.S.C. § 1291, appellate jurisdiction is limited to the review of final decisions, which ordinarily are decisions that end the litigation on the merits so that nothing remains for the court to do but to execute the judgment. *See, e.g., Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013). Orders denying summary judgment do not satisfy this general rule. But because qualified immunity protects public employees from the burdens of litigation as well as from liability, an order denying a summary-judgment motion asserting qualified immunity may be treated as a final decision under the collateral-order doctrine insofar as the appeal from such an order raises abstract legal questions. *See id.* at 1266–67. This limited interlocutory jurisdiction permits us to review "whether the set of facts identified by the district court is sufficient to establish a violation of a clearly established constitutional right" but not "whether the district court correctly identified the set of facts that the summary judgment record is sufficient to prove." *Morris*, 672 F.3d at 1189 (internal quotation marks omitted).

Plaintiff contends that we lack jurisdiction because the district court based its denial of the summary-judgment motions on the existence of fact questions that must be resolved by a jury before the legal issues may be addressed. We have jurisdiction, however, because we may determine whether Cherry and Smith are entitled to qualified immunity by applying clearly established law to the facts for which the district court said there was sufficient supporting evidence. *See id.*; *Medina v. Cram*, 252 F.3d 1124, 1130

6

(10th Cir. 2001). For context, we will also refer to some uncontroverted facts; and we will address some of Cherry's flawed arguments based on his version of events.

## II. CHERRY'S APPEAL

### A. Factual Background

In May 2011, Randall Palmer pleaded guilty in Seminole County District Court in two cases on felony charges of selling methamphetamine. He requested admission into the county's drug-court program and agreed to abide by the terms of a performance contract, one of which was the requirement that he attend all court sessions. He apparently failed to do so, and on September 9, 2011, a bench warrant issued, citing as the crime "Failure to Appear/Non-Compliance with Performance Contract." Aplt. App. (Smith), Vol. 3 at 1227 (full capitalization omitted). The warrant stated no address. Randall had lived at 1931 Killingsworth Avenue in Seminole through 2008, but thereafter the only residents were his son Aaron, Plaintiff, their three-year-old daughter, and their foster son. Although he no longer lived there, Randall would come to the house when Plaintiff was not there.

Cherry testified that on August 25, 2012 (almost a year after issuance of the warrant) he saw a person he presumed to be Randall in Aaron's garage. He did not attempt to take Randall into custody at that time. Instead, he contacted the Seminole Police Department to enlist their assistance and then met with several police officers at a convenience store in Seminole to plan Randall's arrest. They arranged that Cherry would lead the other officers to Aaron's house, where some officers would follow Cherry as he

7

went to the front of the house and others would cover the back to prevent Randall's escape.

Cherry testified that when he returned to the neighborhood of Aaron's house, he saw somebody who appeared to be Randall running through the garage into the house. He immediately ran to the front door with gun drawn yelling "police," pushed the door open, and "[w]ithin two seconds" shot Aaron, who was standing a few feet from the door, allegedly holding a knife. Aplt. App. (Cherry), Vol. II at 510, 513.[2] Randall was not found on the premises.

### B.    Unlawful Entry

In arguing for qualified immunity on Plaintiff's claim of unlawful entry into Aaron's home, Cherry's brief on appeal relies on only one legal theory—hot pursuit of a fleeing felon. Although it mentions the bench warrant in one sentence, it cites no law concerning the authority the warrant gave him.[3] Cherry's hot-pursuit argument cannot withstand scrutiny. It is founded on two legal errors.

---

[2] A knife was found in the foyer of the home after the shooting. Cherry's statements about whether he saw a knife before shooting are somewhat inconsistent. It is not disputed that Aaron had just been preparing a hamburger when Cherry barged in.

[3] This is probably wise. Even if the warrant authorized a search of Aaron's home for Randall—a doubtful proposition itself under our case law, *see Valdez v. McPheters*, 172 F.3d 1220, 1225–26 (10th Cir. 1999) (entry of residence is permissible under arrest warrant only if officer reasonably believes suspect resides there)—it would not overcome the requirement that the officer must knock and wait a reasonable time before entering, *see, e.g., Hudson v. Michigan*, 547 U.S. 586, 589 (2006).

First, Cherry claims that he thought he saw Randall running into Aaron's house from the garage just before he barged into the house himself, and that his belief is all that matters. But the law is clear that Cherry's belief must be reasonable. *See Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014) ("The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved."); *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1071 (10th Cir. 2010) (Fourth Amendment analysis focuses on the objective reasonableness of the challenged conduct in the totality of the circumstances). And Cherry does not confront the possibility that a jury might reasonably refuse to credit his belief as reasonable. It could well find that Cherry is not telling the truth about seeing someone running, or at least that he was not reasonable in inferring that the person he saw was Randall, especially given other evidence that Randall was not seen by anyone else at the time and was not found there after the shooting.

Second, even if we assumed that Cherry had a reasonable belief that Randall had just entered the home, Cherry's hot-pursuit-of-a-fleeing-felon argument is still fatally flawed as a matter of law. He identifies no felony other than Randall's drug offenses. Cherry appears to believe that once a person has committed a felony, he is fair game for "hot pursuit" whenever he is spotted. This is a gross misunderstanding of the law. At the time of the shooting, clearly established law on hot pursuit required an "immediate or continuous" pursuit of a suspect from the crime scene. *Welsh v. Wisconsin*, 466 U.S.

9

740, 753 (1984); *see United States v. Santana*, 427 U.S. 38, 42–43 (1976); *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967). Yet Randall's drug felonies were more than a year in the past.

Cherry relies on *Santana*, 427 U.S. 38, and *Stanton v. Sims*, 134 S. Ct. 3 (2013), as support for his conduct. But both cases featured a pursuit that began in a public place and immediately continued into private property. In *Santana*, officers arrested a woman who had just obtained drugs at a house and sold them to an undercover officer. *See Santana*, 427 U.S. at 40. When the woman said she had paid a "Mom Santana" for the drugs, the officers promptly returned to the house, where Santana was standing in the doorway. *Id.* The Supreme Court said that the officers could pursue Santana when she retreated into the house. *See id.* at 42–43. Similarly, in *Stanton* an officer was pursuing a man who had committed the offense of disobeying the officer's order to stop. *See Stanton*, 234 S. Ct. at 4. The officer pursued the man into a fenced-in yard. *See id.* Not only are the facts unlike those here, but *Stanton* confirmed that there had been no hot pursuit in *Welsh*, 466 U.S. 740, because "there was no immediate or continuous pursuit of Welsh from the scene of a crime." *Id.* at 6 (brackets and internal quotation marks omitted).

Cherry's entry of Aaron's home was clearly contrary to well-established law. He is not entitled to qualified immunity on the claim of unlawful entry. And because a reasonable jury could determine that the unlawful entry was the proximate cause of the fatal shooting of Aaron, *cf. Martinez v. Carson*, 697 F.3d 1252, 1255–56 (10th Cir. 2012) (reasonable jury could find unlawful seizure was the proximate cause of later prolonged

10

detention), we need not decide whether Cherry used excessive force when he confronted Aaron.

## III.   SMITH'S APPEAL

### A.   Background

Cherry started working as a drug-court compliance officer on July 25, 2012.  His prior experience included seven months as a volunteer reserve police officer for the City of Wewoka, Oklahoma, and two years as a corrections officer in Oklahoma.  The Oklahoma Council on Law Enforcement Education and Training ("CLEET") had no record that Cherry had received any formal law-enforcement training.

Tammy Wall, Cherry's supervisor as Seminole County Special Programs Administrator, testified that she has no formal law-enforcement training and has never worked in law enforcement.  She is not qualified to train officers on law-enforcement duties, and neither she nor her agency provide such training to drug-court compliance officers.  Wall left it to Smith to ensure that the deputy sheriffs who worked as drug-court compliance officers were trained.  Smith, however, did not check to see what training Cherry had before he commissioned him, and left it to Wall to train and supervise Cherry, despite knowing that Wall was not CLEET-certified and had no law-enforcement training or expertise.

Smith commissioned Cherry two days before Cherry began work as a compliance officer.  In district court it was disputed whether Smith or Wall was Cherry's employer, but the court determined that Smith was the employer and Smith acknowledges that this

11

status is settled for purposes of this appeal. (To deny summary judgment the court needed to determine only that there was substantial evidence that Smith was the employer.)

### B. Plaintiff's Legal Claim

Plaintiff's theory of individual liability against Smith is that Smith knew Cherry would be required to serve warrants and make arrests; Smith had a duty to train and supervise Cherry because of the foreseeable risk that Cherry would violate the constitutional rights of citizens absent adequate training and supervision; despite this, Smith failed to provide any training or supervision to Cherry; Smith was deliberately indifferent to the risk to the public from his failure to train or supervise Cherry; Cherry violated Aaron's clearly established Fourth Amendment rights; Smith's failure to train or supervise Cherry foreseeably caused Cherry to violate Aaron's constitutional rights; and at the time of the shooting the law was clearly established that Smith had a duty to train and supervise Cherry and would be liable to a victim of Cherry's unconstitutional acts in these circumstances. *See generally Wilson v. Montano*, 715 F.3d 847, 856–58 (10th Cir. 2013) (stating requirements for supervisory liability under § 1983), *cert. denied*, 134 S. Ct. 426 (2013); *Poolaw v. Marcantel*, 565 F.3d 721, 732–33 (10th Cir. 2009) (same). Smith moved for summary judgment in the district court, raising the defense that he was entitled to qualified immunity. The court denied the motion.

Smith challenges the denial of his motion on several grounds. First, he argues that we should reverse because the district court failed to rule on his qualified-immunity

defense and because Plaintiff failed to respond to his qualified-immunity argument below. We disagree. The district court denied the motion. That is the only prerequisite for us to review a legal challenge to the denial. If the district court failed to address an issue, we can still reverse on that ground if the issue was preserved and is meritorious. *See Sac & Fox Nation v. Norton*, 240 F.3d 1250, 1264–67 (10th Cir. 2001) (appellate court reverses on a question of law not reached by the district court); *Lowe v. Town of Fairland,* 143 F.3d 1378, 1380 (10th Cir. 1998) (reviewing appeal from denial of motion for qualified immunity despite district court's failure to address the issue). Likewise, any failure by Plaintiff to respond to Smith's summary-judgment motion is irrelevant in light of the district court's denial of the motion. To be sure, if the court had granted the motion, Plaintiff would be significantly restricted on any appeal because all arguments not made in the district court would have been forfeited. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128, 1130–31 (10th Cir. 2011). But as appellee, Plaintiff can raise arguments for affirmance supported by the record. *See id.* at 1130.

The important procedural failure in this case is not Plaintiff's or the district court's but Smith's. His motion for summary judgment did not raise any ground on which we can reverse. The argument section of the motion devotes four pages to Plaintiff's § 1983 claim against him in his individual capacity. It notes, correctly, that because he was not personally involved in the August 25, 2012 incident until after the shooting, his liability could only be as a supervisor. Next it summarizes his view of the law of supervisory liability and argues that he is not liable under that law because (1) Cherry did not violate

13

the Constitution and (2) even if he did, "Cherry was not an employee or officer of Sheriff Smith." Aplt. App. (Smith), Vol. 1 at 255. It then summarizes his view of the law of qualified immunity but concludes that "[t]he second stage of qualified immunity analysis, whether a right was 'clearly established' need not even be performed, as Defendant Smith did not personally violate Plaintiff's constitutional rights in any way whatsoever." *Id.* at 256–57 (footnote omitted).

Smith raised no argument below that he would be entitled to qualified immunity even if Cherry was his employee. Yet given his concession that he cannot challenge on appeal the district court's determination that Cherry was his employee, this foregone argument would be his only path to reversal. Because he does not argue on appeal that the district court committed plain error, we do not address that possibility. *See Richison*, 634 F.3d at 1130–31. We affirm the denial of qualified immunity.

## IV.   CONCLUSION

We DENY Plaintiff's motion to dismiss this appeal for lack of jurisdiction and AFFIRM the district court's denial of the defendants' motions for summary judgment based on qualified immunity.

14