JAMES E. GRITZNER, Senior Judge, U.S. DISTRICT COURT
This matter comes before the Court on a Motion for Summary Judgment (the Motion)
*1017 pursuant to Federal Rule of Civil Procedure 56 filed by Defendants James Carle (Carle), Karl Judd (Judd), and the City of Fort Madison, Iowa (the City) (collectively, Defendants). Plaintiffs Ivan Swearingen (Ivan) and Ronda Swearingen (Ronda), administrators of the estate of Ryan Swearingen (Ryan) (collectively, Plaintiffs), resist the motion. No party requested a hearing on the Motion, and the Court finds a hearing is unnecessary. The matter is fully submitted and ready for disposition.
I. BACKGROUND[1]
This case presents the tragic consequences resulting from the collision between an individual's unfortunate and dangerous behavior and the reaction of law enforcement officers in performance of their duty under extreme circumstances. On August 2, 2014, several members of the Swearingen family, including Ryan and Ryan's children, gathered for a cookout at Ivan and Ronda's residence (the Swearingen home), located at 1527 Avenue E, Fort Madison, Iowa. Ryan and his children were overnight guests at the residence. Ronda went to bed around 10:30 p.m., and Ivan went to bed around 11:30 p.m. Ryan did not go to bed.
At 1:16 a.m. the next morning, Carle called Mendy LeMoyne. Carle was a police captain with the City of Fort Madison who, that night, was working the overnight shift. LeMoyne was at her home, 1429 Avenue E, Fort Madison, Iowa, which she shared with Carle. LeMoyne's home was less than a block from the Swearingen home. During their call, LeMoyne noticed an individual, later identified as Ryan, in the alley slashing the tires on cars belonging to the tenants of Carle's rental property at 1428 Avenue D, Fort Madison, Iowa. The backyard was somewhat lit, enabling LeMoyne to discern that Ryan was wearing a plain white t-shirt, black gym shorts, and tennis shoes. LeMoyne informed Carle that Ryan had slashed tires on three cars with a knife. Ryan looked at LeMoyne through the window and, holding the knife, Ryan wiggled it over his head.
Carle drove to the LeMoyne/Carle home to investigate. When Carle arrived, Ryan was bent over Carle's pick-up truck near the rear driver's side tire. Ryan saw Carle and took off running north through the yard of Carle's rental property. At 1:45 a.m., Carle notified dispatch that Ryan was popping tires and running from authorities. Judd later told investigators that Carle had radioed he was pursuing "Ryan Swearingen." Carle initially followed Ryan in his squad car and then pursued Ryan on foot into the 1500 block alley between Avenues D and E. Despite Carle's repeated warnings to stop, Ryan kept running.
At 1:46 a.m., Carle saw Ryan enter and lock the back door of the Swearingen home. Carle knew that it was the Swearingen home that Ryan had entered, and he informed dispatch of Ryan's entry. Multiple officers responded to the Swearingen home at 1:47 a.m., including Officer Judd, Officer Tanner Hartman (Hartman), Officer Haris Smajlovic (Smajlovic), and Reserve Officer Kevin Riggs (Riggs). Smajlovic and Riggs went to the front of the house to stand guard in case anyone attempted to leave by the front door. Judd and Hartman joined Carle at the back of the house. Hartman, at one point, checked the side of the Swearingen home to determine there was no attempt by Ryan to flee the scene through a window.
Around this time, Ronda and Ivan were awakened by the sound of their dog barking.
*1018 Ronda heard police officers beating on the door, demanding that the door be opened, and saw Ryan holding green and white knives in his hands.[2] As this was happening, the officers saw Ryan walking around inside the home. Ryan then approached the back door, holding the green-handled knife in a reverse grip position. Ryan spun around in a frantic manner and appeared to be looking for a place to hide. The officers again commanded Ryan to open the door, and also, to drop any knives. Carle and Smajlovic saw Ryan holding a green knife, and Hartman saw Ryan with a green-handled knife in his hand, in a reverse grip position. Ivan entered the laundry room near the back door, where he saw Ryan standing against the wall and, like the officers, observed Ryan holding a knife. Carle, who was still outside, recognized Ivan and called on him by name to open the door. Ivan asked if the officers had a warrant and objected to their entry. The officers continued yelling at both Ryan and Ivan to open the door, but neither complied.
At 1:49 a.m., Carle determined that officers should forcibly enter the Swearingen home. Smajlovic then entered the Swearingen home through the unlocked front door. Smajlovic unholstered his service pistol, pointed it at Ryan, and yelled at Ryan multiple times to drop the knife. Ryan did not drop the knife or knives. Moving out of view of the officers, Ryan entered a walk-through closet that had one door going into a bedroom and another door going into the laundry room near the back door.
Meanwhile, Carle entered the Swearingen home through the back door by shattering the glass and reaching through the pane to release the lock. Carle was followed by Judd and Hartman. Carle and Judd drew their service pistols. Hartman drew his taser after Judd suggested that he do so. When Carle entered the house, he could not see Ryan.
While trying to locate Ryan, Judd saw the walk-through closet door, which was to his right, move a couple inches. Riggs also observed that the closet door was cracked about one-half inch and warned the other officers. Riggs, with his taser drawn, pointed the taser's laser light dot inside the cracked-open door, hoping that if someone was behind the door, they would see the dot and give up. Judd, grabbing the closet door handle with his right hand and holding his pistol in his left hand, pulled the closet door open. The parties do not dispute that Ryan was standing behind the closet door, but dispute Ryan's posture and orientation.[3] Judd stepped back and fired three shots that struck Ryan. When the shots were fired, only two to three feet separated Judd and Ryan. Hartman cleared the door and pointed the red light from his taser at Ryan's left shoulder as Ryan fell to the ground. Hartman could see that Ryan had gunshot wounds on his left side and was gripping a knife in the same reverse-grip position as Hartman had observed earlier. When the shots were fired, Ronda could not see Ryan. Ivan could only see part of Ryan's torso and left arm but could not see either of Ryan's *1019 hands, and Ivan did not see Judd fire the shots.
At 1:51 a.m., Carle requested an ambulance at the Swearingen home. Riggs spotted a green-handled knife underneath Ryan's arm, with the blade pointing toward Ryan's body, retrieved it, and relocated it to the top of the washer and dryer. When emergency care units arrived at the scene, Lieutenant Mike Schneider of the Fort Madison Fire Department observed a black-handled kitchen knife on the floor next to Ryan's body. Ryan had sustained three gunshot wounds : the first entered his left upper arm with a back-to-front trajectory, the second entered his left mid-back with a back-to-front trajectory, and the third entered his left buttock. Ryan was transported to the Fort Madison Community Hospital where he later died.
Judd told investigators he believed that Ryan was a threat to the Swearingen family, that Ryan's mannerisms and actions indicated that he was out to do bodily harm to the officers, and that Judd was in imminent fear for his life. The Iowa Attorney General's Office Area Prosecution Division reviewed the incident to determine if criminal charges were warranted against Judd. The Attorney General's office concluded exigent circumstances supported the officers' warrantless entry into the home, and Judd's use of deadly force was justified.
On March 4, 2017, Plaintiffs filed the instant lawsuit against Defendants, asserting two claims under 42 U.S.C. § 1983. Count I of the Complaint alleges that Carle and Judd violated Ryan's Fourth Amendment rights by entering the Swearingen home without a warrant and that Judd violated Ryan's Fourth Amendment rights by using excessive force. Count II alleges that the City violated Ryan's Fourth Amendment rights by maintaining policies and customs, which directly and proximately caused Carle and Judd's unconstitutional conduct, and by failing to properly train its police officers. Defendants filed this motion, arguing that they are entitled to summary judgment on Count I because no Fourth Amendment violation occurred and, alternatively, because the officers are entitled to qualified immunity. Defendants maintain they are entitled to summary judgment on Count II, the municipal liability claim, because the officers are not liable for any underlying misconduct and there is no evidence of prior notice to the City of any deficiencies in policies or training. Plaintiffs resist.
II. DISCUSSION
A. Standard for the Motion for Summary Judgment
"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact.' " Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (alterations in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). If the movant makes such a showing, to avoid summary judgment the nonmovant must "set out 'specific facts showing that there is a genuine issue for trial.' " Id. (quoting Celotex, 477 U.S. at 324, 106 S.Ct. 2548 ). The Court views the facts presented on summary judgment in the light most favorable to the nonmovant. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, a genuine issue for trial requires more than "some metaphysical doubt as to the material facts." Torgerson, 643 F.3d at 1042 *1020 (quoting Matsushita, 475 U.S. at 586, 106 S.Ct. 1348 ).
"Qualified immunity shields a government official from liability and the burdens of litigation unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Wright v. United States, 813 F.3d 689, 696 (8th Cir. 2015). Determining whether a government official is entitled to qualified immunity involves a two-step inquiry: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. (citing Pearson v. Callahan, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ). The official is entitled to qualified immunity "unless the answer to both of these questions is yes." Burton v. St. Louis Bd. of Police Comm'rs, 731 F.3d 784, 791 (8th Cir. 2013) (citation omitted). The Court can "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236, 129 S.Ct. 808.
"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Blazek v. City of Iowa City, 761 F.3d 920, 922 (2014) (quoting Stanton v. Sims, 571 U.S. 3, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) ). "To avoid summary judgment based on qualified immunity, [Plaintiffs] must offer sufficient evidence to show a genuine issue of material fact about whether a reasonable officer would have been on notice that the officer's conduct violated a clearly established right." Wright, 813 F.3d at 695. Defendants are entitled to qualified immunity if, taking the facts in the light most favorable to Plaintiffs, the Court finds "there are no material issues of fact and [Defendants'] actions were objectively reasonable in light of the law and the information [they] possessed at the time." Engleman v. Murray, 546 F.3d 944, 948 (8th Cir. 2008).
B. Count I: Warrantless Entry (Carle and Judd)
Defendants argue they are entitled to summary judgment on Plaintiffs' Fourth Amendment warrantless entry claim because Ryan had no Fourth Amendment expectation of privacy in the Swearingen home, Carle and Judd were in hot pursuit, and Carle and Judd are entitled to qualified immunity.
1. Ryan Swearingen's Expectation of Privacy
Defendants argue that Ryan had no Fourth Amendment right to privacy in the Swearingen home. They emphasize that Ryan was neither a resident nor owner of the Swearingen home. Plaintiffs resist, arguing that Defendants have overlooked Supreme Court precedents providing that overnight guests like Ryan have Fourth Amendment standing.
The capacity to claim the protection of the Fourth Amendment depends on whether the person making the claim has a legitimate expectation of privacy in the invaded space. Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). An overnight guest in a private residence has a legitimate expectation of privacy in the host's home. Minnesota v. Olson, 495 U.S. 91, 99-100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).
It is undisputed that Ryan was an overnight guest in the Swearingen home. Thus, the Court must conclude Ryan had a legitimate expectation of privacy in the Swearingen home.
*1021 2. Carle and Judd's Entitlement to Qualified Immunity
Carle and Judd argue that, even if the Court finds that Ryan had a legitimate expectation of privacy in the Swearingen home, the warrantless entry was justified by exigent circumstances, including the officers' hot pursuit of Ryan. Carle and Judd further argue that, regardless of the applicability of the hot pursuit exception for warrantless entry, they are entitled to qualified immunity. Plaintiffs respond that no exigent circumstance exception applied and that the officers are not entitled to qualified immunity.
As noted, the Court has discretion as to which step of the qualified immunity inquiry to address first. Pearson, 555 U.S. at 236, 129 S.Ct. 808. Based on pivotal precedent regarding such a warrantless entry, the Court begins its inquiry by assessing whether Carle and Judd's conduct violated clearly established law at the time of the incident.
Though the Fourth Amendment protects individuals from the warrantless entry of their homes, "[p]olice officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect." United States v. Anderson, 688 F.3d 339, 343-44 (8th Cir. 2012) (quoting Kentucky v. King, 563 U.S. 452, 460, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) ). In determining whether hot pursuit creates an exigent circumstance, the Court considers "(1) the gravity of the underlying offense, and (2) whether the government can demonstrate an 'immediate or continuous' pursuit of the suspect from the scene of the crime." Id. at 344 (quoting Welsh v. Wisconsin, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) ). In 2013, nine months prior to the facts giving rise to this lawsuit, the Supreme Court held that it is not clearly established that a police officer in hot pursuit of a mere misdemeanant violates the Fourth Amendment when entering a home without a warrant. Stanton, 134 S.Ct. at 5-7 ; see also Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994) (holding that officers were entitled to qualified immunity where officers were in hot pursuit of misdemeanants, given divided federal precedents on what offenses justified warrantless entry based on hot pursuit, and since applicable state law allowed warrantless home arrests of misdemeanants). Thus, in the event Carle and Judd's warrantless entry was premised on hot pursuit of a suspect who had committed at least a misdemeanor, the Court would be required to find they are entitled to qualified immunity.
The parties agree that Ryan's tire slashing was, at minimum, misdemeanor criminal mischief. The record further reveals that Carle and Judd's pursuit of Ryan was "immediate or continuous" from the scene of the tire slashing. See Anderson, 688 F.3d at 344. In Anderson, the Eighth Circuit deemed the officers' pursuit immediate or continuous where the suspect's crime occurred on a public street, the suspect fled upon seeing the police officers, and the officers pursued the suspect onto the balcony of an apartment and "did not, at any point, give up the pursuit." Id. at 344-45. Here, Carle's pursuit began in the alley outside of Carle's rental property, after observing Ryan bent over the rear driver's side tire of Carle's pick-up truck. After seeing Carle, Ryan fled. Carle continuously pursued Ryan, first by car and then on foot, until Ryan entered the Swearingen home. During his pursuit, Carle notified dispatch that Ryan was witnessed popping tires and running from authorities, which prompted Judd and other officers to respond to the Swearingen home within minutes.
Plaintiffs argue that Carle could not have been in hot pursuit, since Ryan had time to take off his shirt and shoes before entering the Swearingen *1022 home. This fact does not materially affect the Court's hot pursuit analysis, which concerns whether the officers' pursuit was immediate or continuous, and not whether the suspect paused during the pursuit. See id. at 344-45.[4]
Carle and Judd were in hot pursuit of a suspect who had committed at least misdemeanor criminal mischief. Because there is no clearly established right against warrantless entry when officers are in hot pursuit of a misdemeanant, Carle and Judd are entitled to qualified immunity for their warrantless entry of the Swearingen home.
C. Count I: Excessive Force (Judd)
Judd moves for summary judgment on Plaintiffs' Fourth Amendment excessive force claim, arguing that he was justified in using deadly force against Ryan under the circumstances, and, in addition, that he is entitled to qualified immunity. Plaintiffs respond that there was no adequate justification for Judd's use of deadly force, and that material questions of fact surrounding the shooting prevent Judd from receiving qualified immunity.[5]
Once again based on pivotal precedent, the Court in this context begins its qualified immunity inquiry by considering whether Judd's conduct violated the Fourth Amendment. All claims that law enforcement officers have used excessive force, deadly or not, are analyzed under the Fourth Amendment's reasonableness standard. See Plumhoff v. Rickard, --- U.S. ----, 134 S.Ct. 2012, 2020, 188 L.Ed.2d 1056 (2014) ; Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Court examines whether Judd's conduct was " 'objectively reasonable' in light of the facts and circumstances confronting [Judd], without regard to [Judd's] underlying intent or motivation." Estate of Morgan v. Cook, 686 F.3d 494, 496-97 (8th Cir. 2012) (quoting Nance v. Sammis, 586 F.3d 604, 610 (8th Cir. 2009) ). Objective reasonableness is judged "from the perspective 'of a reasonable officer on the scene, rather than with *1023 the 20/20 vision of hindsight.' " Plumhoff, 134 S.Ct. at 2020 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865 ). The Court allows for the fact that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving- about the amount of force that is necessary in a particular situation." Id. (quoting Graham, 490 U.S. at 396-97, 109 S.Ct. 1865 ). Among the factors the Court considers in determining whether an officer's use of force was reasonable are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight." Morgan, 686 F.3d at 497 (quoting Nance, 586 F.3d at 610 ). Judd's use of deadly force was not constitutionally unreasonable if Judd had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or others." Id. (quoting Nance, 586 F.3d at 610 ).
In Morgan, the Eighth Circuit held that an officer's use of deadly force was objectively reasonable, and therefore no Fourth Amendment violation occurred, where a knife-wielding suspect refused to comply with police orders to drop his weapon and appeared to take a step toward the officer, with no more than twelve feet separating the suspect and officer. Id. at 496-97. The Eighth Circuit has further held that "no constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon." Smith v. City of Brooklyn Park, 757 F.3d 765, 772 (8th Cir. 2014) (per curiam) (quoting Sinclair v. City of Des Moines, 268 F.3d 594, 596 (8th Cir. 2001) (per curiam)). In Smith, the Eighth Circuit held that an officer's use of deadly force was objectively reasonable where the victim was armed with a gun and refused to obey commands from officers to drop his weapon. Id. at 774-75. By contrast, in Nance, the Eighth Circuit held that material questions of fact as to the reasonableness of an officer's use of deadly force prevented a grant of summary judgment where it was disputed whether officers had identified themselves as police officers; whether the suspect's toy gun remained tucked in his pants throughout the confrontation; whether the suspect was attempting to comply with officer orders to get on the ground; and whether the officer shot the suspect without warning. Nance, 586 F.3d at 610-11.
As in Morgan and Smith, Ryan did not comply with the officers' repeated orders to drop his weapon. Unlike in Nance, here, it is undisputed that Ryan was holding at least one knife before, during, and immediately following his encounter with Judd in the closet. Additionally, whereas in Morgan the distance between officer and suspect was twelve feet, here, the distance between Judd and Ryan was no more than two to three feet.
Judd testified that when he pulled the closet door open,[6] Ryan raised-up *1024 while holding the green-handled knife in a dagger position near his face, and stepped forward as if he was going to lunge at Judd. Judd asserts that, based on his training for close quarters, he stepped back and fired three shots at Ryan. Judd told investigators that he believed Ryan's mannerisms and actions indicated he was out to do bodily harm to others, and that this caused Judd to be in imminent fear for his life.
Plaintiffs dispute Judd's account and attempt to distinguish Morgan by pointing to evidence that, viewed in Plaintiffs' favor, suggests that Ryan did not step toward Judd while brandishing a knife. Hartman demonstrated for investigators that Ryan was holding the knife by its handle, with the blade pointed up toward his elbow, both before and immediately following Ryan's encounter with Judd. Ivan testified that, from where he was standing in the kitchen, he could see the left side of Ryan's torso when the closet door opened. The autopsy revealed that Ryan sustained three gunshot wounds which, respectively, entered his left upper arm with a back-to-front trajectory, his left mid-back with a back-to-front trajectory, and his left buttock.
There is, indeed, an issue of fact as to whether Ryan moved toward Judd during their closet confrontation. But the Court is compelled to conclude this is not a material question of fact. Under the circumstances, given the distance between Ryan and Judd, Ryan's possession of at least one knife, Ryan's behavior up to that point, and the split-second circumstances, the record is adequate that a reasonable officer could have concluded that deadly force was justified. Ryan's behavior immediately preceding this encounter was erratic and, from the standpoint of a reasonable officer, dangerous. Ryan fled from police after being witnessed popping tires with a knife-a deadly weapon. Ryan did not drop his knife or knives despite multiple commands from officers to do so. It is undisputed that Ryan's behavior was at one point "frantic," and he was "looking for some place to hide." Defs' SUF ¶ 47, ECF No. 22-1; Pls' Resp. ¶ 47, ECF No. 27-1. After fleeing into the Swearingen home, Ryan was discovered by Ivan standing against a wall, holding a knife. Ryan later entered the walkthrough closet, where police officers could not see him. Whether Ryan intended to ambush the officers or was hiding out of fear is not the inquiry for this Court. Rather, the Court must ask whether it was "objectively reasonable" for Judd to believe that Ryan posed "a threat of serious physical harm." See Morgan, 686 F.3d at 496-97. Judd was forced to make a "split-second judgment[ ]" while confronting an apparently lethal weapon-a suspect wielding a knife from a distance of two to three feet. See Smith, 757 F.3d at 772.
The parties dispute whether Judd warned Ryan that he would use deadly force before the confrontation. "Before employing deadly force, an officer should give 'some warning' when it is 'feasible' to do so." Loch v. City of Litchfield, 689 F.3d 961, 967 (8th Cir. 2012) (quoting Tennessee v. Garner, 471 U.S. 1, 11-12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ). Even if Judd did not proffer such a specific warning, his conduct was reasonable. The officers' repeatedly warned Ryan to drop his weapon, and Judd's ability to warn Ryan within the home, including by raising his pistol, was compromised given the narrow distance separating the two men when opening the closet door that separated them. See Morgan, 686 F.3d at 498 (finding that suspect should have been on notice that his "escalation of the situation would result in the use of the firearm," where officer raised his gun and ordered the suspect to put the *1025 knife down multiple times, and where officer did not have time to utter a more specific warning since only six to twelve feet separated officer and suspect).
The precedents set forth in Morgan and Smith compel the conclusion that Judd reasonably believed Ryan was a threat to himself and possibly others, including his fellow officers. As a result, Judd's use of deadly force did not violate Ryan's Fourth Amendment rights. Judd is entitled to qualified immunity. The legal conclusion compelled in this case in no way diminishes the immeasurable loss to the Swearingen family.
D. Count II: Municipal Liability
The City argues it is entitled to summary judgment on Plaintiffs' municipal claim, since Carle and Judd are not liable for any underlying Fourth Amendment violation. The City argues that, even if questions of fact preclude summary judgment against the officers, the City cannot be found liable given the absence of liability under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
"A municipality may not be held liable under section 1983 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.' " Seymour v. City of Des Moines, 519 F.3d 790, 800 (8th Cir. 2008) (quoting Monell, 436 U.S. at 691, 98 S.Ct. 2018 ). Municipal liability does not attach "unless individual liability is first found on an underlying substantive claim." Schoettle v. Jefferson Cty., 788 F.3d 855, 862 (8th Cir. 2015). No individual liability has been found, and therefore no municipal liability can be attached.
III. CONCLUSION
Based on the foregoing, the Motion for Summary Judgment, ECF No. 22, submitted by Defendants is granted as to all counts.
IT IS SO ORDERED.

The facts here are either materially undisputed or, if genuinely disputed, viewed in the light most favorable to the nonmoving party. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

Depending on the perspective of the individual highlighted, Defendants' Statement of Undisputed Facts is inconsistent as to whether Ryan was holding one or multiple knives. What appears undisputed is that Ryan was holding at least one knife throughout the entire encounter at the Swearingen home.

According to Judd, Ryan raised up, holding the green-handled knife in a dagger position near his face, and stepped forward as if he was going to lunge at Judd. On the other hand, Hartman demonstrated for investigators that Ryan was holding the knife by its handle, with the blade pointed up toward his elbow, both before and immediately following Ryan's encounter with Judd, and Ivan testified that, from where he was standing in the kitchen, he could see the left side of Ryan's torso when the closet door opened.

Plaintiffs offer a secondary argument: that any exigent circumstances were of the officers' own making. In determining whether police manufactured exigent circumstances, the Court considers the "reasonableness and propriety of the investigative tactics that generated the exigency." United States v. Cisneros-Gutierrez, 598 F.3d 997, 1005 (8th Cir. 2010) (citation omitted); cf. United States v. Johnson, 12 F.3d 760, 764-65 (8th Cir. 1993) (holding that, by substituting cocaine base with a different substance in a package, placing a beeper within the package, and executing controlled delivery of the package, inspectors generated a risk that evidence would be destroyed, thereby creating the exigency that led to a warrantless entry). Here, Carle and Judd's investigative conduct created no such exigency. Carle received word that Ryan was slashing tires, observed Ryan bent over his truck, and began his pursuit immediately thereafter. Judd began his pursuit after receiving word from Carle over dispatch. The officers were lawfully executing their law enforcement duties by pursuing a suspect observed committing a crime. Carle and Judd did not create the exigency that led to the hot pursuit and resulted in the warrantless entry.

Plaintiffs also argue that the Court should not address whether Judd is protected under qualified immunity for excessive use of force in light of Attocknie v. Smith, 798 F.3d 1252 (10th Cir. 2015). In Attocknie, the Tenth Circuit held that "because a reasonable jury could determine that [an] unlawful entry was the proximate cause of [a] fatal shooting ... we need not decide whether [Defendant] used excessive force." Id. at 1258. This case differs from Attocknie, as Carle and Judd are entitled to qualified immunity for their warrantless entry. Moreover, the Eighth Circuit has held that "the objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional," and therefore, "[deadly force] may not be found unreasonable by reference to some separate constitutional violation." Frederick v. Motsinger, 873 F.3d 641, 645-46 (8th Cir. 2017) (quoting Cty. of L.A. v. Mendez, --- U.S. ----, 137 S.Ct. 1539, 1547, 198 L.Ed.2d 52 (2017) ).

Plaintiffs note that, unlike several of his counterparts, Judd failed to use available non-lethal measures to subdue Ryan. Though Hartman and Riggs were armed with tasers, Judd approached the closet door with his service pistol deployed. However, that is not the standard this Court must employ. The Eighth Circuit has "declined to second-guess whether alternative actions by police officers might conceivably have been available." Morgan, 686 F.3d at 497 (citation and internal quotation marks omitted). As the Morgan court reasoned, "[i]t may appear, in the calm aftermath, that an officer could have taken a different course, but we do not hold the police to such a demanding standard"; rather, the inquiry is whether a police officer's use of force is objectively reasonable under the circumstances. See id. (holding that deadly force was justified against knife-wielding suspect despite non-lethal alternatives, such as using baton or pepper spray to disarm suspect or warning suspect that deadly force would be used if suspect got any closer to officer).